RURAL WATER COMPANY, INC. *v.* ZONING BOARD OF APPEALS OF THE TOWN OF RIDGEFIELD (SC 17959)

Rogers, C. J., and Katz, Vertefeuille, Zarella and Schaller, Js.

Argued March 18—officially released June 10, 2008

*Robert A. Fuller*, for the appellant (plaintiff).

*Patricia C. Sullivan*, with whom was *Barbara M. Schellenberg*, for the appellee (defendant).

*Opinion*

KATZ, J. The present case arises from the decision of the defendant, the zoning board of appeals of the town of Ridgefield (board), denying the application of the plaintiff, Rural Water Company, Inc., for the variances necessary to construct a single-family dwelling on a 0.284 acre piece of property (property) located on Split Level Road in the town of Ridgefield (town). The plaintiff appeals from the trial court's judgment dismissing its appeal from the decision of the board, principally claiming that the trial court improperly concluded that: (1) the board's determination that the plaintiff had not demonstrated the hardship necessary for a variance was supported by substantial evidence; and (2) the board's denial of the plaintiff's application was not tantamount to a taking without just compensation under the fifth amendment to the federal constitution and article first,

§ 11, of the Connecticut constitution.[1] We disagree and, thus, we affirm the judgment of the trial court.

The board reasonably could have found the following facts. The property originally was part of a large parcel of land that was subdivided into numerous smaller lots in 1956. One of these lots later was divided into two lots: a 0.618 acre parcel and a 0.284 acre parcel, the latter being the property at issue in this appeal. At the time, the minimum lot size for the zone in which the two parcels were located was 10,000 square feet. In 1966, the town rezoned the property to an RA residential zone and increased the minimum lot size for that zone to one acre. The property, with an area of 12,392 square feet, is the smallest lot in the subdivision. The rezoning made the property a nonconforming lot. As they do presently, the town's zoning regulations then in effect permitted a residential building to be constructed on a nonconforming lot, provided that various conditions were satisfied. Two such conditions required that a deed describing the lot had been recorded prior to the effective date of the regulations or any amendment thereto, or any zoning change, and that the lot met the conditions for the next less restrictive residential zone. See Ridgefield Zoning Regs., § 304.0 (5) (2004);[2] Ridge-

[1] The fifth amendment to the United States constitution provides in relevant part: "[P]rivate property [shall not] be taken for public use, without just compensation."

Article first, § 11, of the constitution of Connecticut provides: "The property of no person shall be taken for public use, without just compensation therefor."

[2] Section 304.0 (5) of the Ridgefield zoning regulations (2004) provides in relevant part: "Nonconforming lot. A parcel of land separately recorded by deed in the office of the town clerk prior to the effective date of these regulations or any amendment thereto, or any zoning change which fails to meet the area, shape or frontage or any other applicable requirements of these regulations pertaining to lots, may be used as a lot, and a building or other structure may be constructed, reconstructed, enlarged, extended, moved or structurally altered thereon, provided that the structure, or any extension thereof, complies with all of the requirements applicable to a lot in the next less restrictive residential zone. . . ."

field Zoning Regs., § 18 (5) (a) (1966). The plaintiff's predecessor in interest, however, did not record the deed to the property prior to the zoning change, and the property does not meet the requirements for the next less restrictive zone.[3]

The plaintiff, a water supply company that now owns several wells in Ridgefield and other towns in the northern part of Fairfield County, acquired the property in 1969, at which time the property first was recorded as an individual lot. Both the plaintiff and its predecessor in interest had used a well on the property to supply water to the subdivision, but never had attempted to build any structure on the property, other than that necessary to house the well.

In 1989, the plaintiff applied to the board for a variance to build a single-family residence on the property. The board voted three to two to deny its application on the following grounds: "1. No unusual hardship exists [at this time] that justifies the grant of a variance in this case. It is noted that the property currently enjoys a use as a well site for the [plaintiff] and this use must continue. Therefore, the zoning ordinance is not depriving the property of a permitted use. 2. The vote to deny is 'without prejudice' to permit the [plaintiff] to return . . . in the event that the [department of public utility

---

[3] We note that, although the plaintiff's counsel suggested at the hearing before the board that the deed had been recorded timely, because the applicable regulation for nonconforming lots, § 304.0 (5), was not adopted until some time after 1969, when the plaintiff recorded the deed to the property, our research has revealed that the regulations prior to 1969 also imposed a recording requirement. See Ridgefield Zoning Regs., § 18 (5) (a) (1966); Ridgefield Zoning Regs., § 18 (5) (a) (1968). The plaintiff concedes in its brief to this court, however, that, even if the deed to the property had been recorded prior to the zoning change, it still could not satisfy another requirement of the exception for development of nonconforming uses because the property does not meet the lot size and frontage provisions of the next less restrictive zone, which requires 20,000 square feet and 100 feet of frontage. Therefore, it is undisputed that, in order to build a residence on the property, the plaintiff would be required to obtain a variance.

control] permits the discontinuation of the well use. If this should happen, the factors affecting . . . unusual hardship would change." The vote sheet reflects that one board member who had voted against the application noted that the lot originally had been a building lot and posited that it could return to that status if the plaintiff removed the well. The two dissenting members had opined that the lot was originally a building lot and that a hardship had been created by the upzoning, which increased the minimum lot size, irrespective of the continued use of the well. One of the dissenters also had noted that there was no land the plaintiff could purchase to increase the area of the property to meet the one acre minimum requirement.

Sometime thereafter, the plaintiff became aware of high radon levels in the "raw" well water. In 2003, the department of public health issued a permit to the plaintiff to abandon the well permanently, conditioned on the plaintiff executing an agreement with another water company, Aquarion Water Company (Aquarion Water), to provide its excess water to the plaintiff's service area and in compliance with relevant agency regulations.[4] Sometime after entering into such an agreement with Aquarion Water, the plaintiff discontinued the use of the well on its property, but did not physically remove it or any of the related equipment. In 2005, the plaintiff entered into a contract with a building contractor, Sturges Brothers, Inc. (Sturges), to sell the property for $210,000 and authorized Sturges to apply for a variance on its behalf to use the property for construction of a single-family dwelling.[5]

---

[4] On or about January 25, 2005, the department of public health issued a "sale of excess water permit" that authorized Aquarion Water to sell up to 50,000 gallons of water per day to provide water to the plaintiff's service area.

[5] The application initially had requested variances for the following requirements contained in the town's zoning regulations: Ridgefield Zoning Regs., § 403.0 (C) (1) (2004) (one acre minimum lot size requirement), § 403.0 (C) (2) (frontage of not less than 100 feet), § 403.0 (D) (lot density), § 403.0 (F) (maximum permissible floor area ratio of 0.11), § 403.0 (G) (building

The record reflects the following additional facts and procedural history. After Sturges obtained a report from the town's zoning enforcement officer, stating that the proposed use of the property did not comply with various zoning regulations, the plaintiff submitted an application for variances to the board, which held public hearings on the application. At the hearings, the plaintiff presented evidence of the history of the property, including a time line of the development of the property and evidence that the deed thereto was recorded in 1969. See footnote 3 of this opinion. It also presented a letter from one of the original owners, Norman Craig, indicating that he always had intended for the property to be used as a building lot at some point in the future. The plaintiff's president, Steven Polizzi, stated that he felt compelled to close the well because the level of radon in the water exceeded "a standard that has not yet been set by the federal or state government . . . for radon." He stated that the well's raw water had a radon level of 100,000 picocuries[6] per liter, when the

---

setback no less than twenty-five feet from any front line, recorded right-of-way or side or rear line), and § 304.0 (5) (permitting construction of residence on nonconforming lot if deed recorded prior to effective date of regulation or rezone and lot meets requirements for next less restrictive zone). The plaintiff did not seek a variance for § 403.0 (E) of the Ridgefield zoning regulations, which limits the maximum lot coverage by buildings to 8 percent of the lot area, because it planned to remove the structure that housed the well and, thus, could meet the requirement of that regulation. Prior to the board rendering its decision, the plaintiff limited its variance request, submitting a letter from its architect confirming that the plaintiff had redesigned its plan to meet the setback, building coverage, building height and floor area ratio requirements for a one acre lot. Thus, the only variances required were for lot area, density and frontage. As the plaintiff concedes, a variance under § 304.0 (5) would not have been needed if it had obtained variances for the other regulations, although if the variance had been granted in lieu of the other variances, the plaintiff would have had to obtain a variance for the requirements of the next less restrictive zone.

[6] A picocurie is a unit used to measure the rate of radioactive decay of radon. One picocurie is the equivalent to the decay of approximately two radioactive atoms per minute. http://www.nsc.org/resources/Factsheets/environmental/radon.aspx (last visited May 27, 2008).

federal guidelines established a standard that was between 300 and 4000 picocuries per liter. He acknowledged, however, that "technically there is no federal or state law that says that I can't use that well because they have been delaying the [adoption of] radon rules for about fifteen years." In response to a suggestion by two board members that the radon could be treated using different methods, the plaintiff's counsel asserted that the radon level was too high to treat. The plaintiff did not offer expert testimony or test results on the radon level to the board.[7]

The board voted three to two to deny the plaintiff's application. The board rested its decision on the following grounds: "1. No unusual hardship was presented that would justify the grant of the variances requested in this case. 2. The parcel has been used since the 1950s as a public utility, providing water to the surrounding subdivision. The wells and ancillary infrastructure are still in place and operable. Since it is the personal desire of the owner to close the wells, any hardship claimed is self-created. 3. The parcel is not being deprived of a use and there is no confiscation or taking of the land. 4. It was noted that this is by far the smallest parcel of land in this subdivision, and its use as a residential lot is not consistent with the character of the surrounding neighborhood."[8]

[7] On the issue of value, one property owner in the subdivision spoke at the hearing and stated that Polizzi had at one point sought approximately $275,000 for the property. He further stated that the town tax assessor had assessed the property's value at $8000.

[8] During the voting session, one board member voting to deny the variance stated the following reasons on the record: "I think they created their own hardship here . . . the way they handled the lot in the first place. . . . [T]hey used it since the 1950s as a public utility, the lot; they are pumping water to supply the neighborhood. That water can be pumped out of there today. They can start that pump up tomorrow and there are ways of getting radon out of water as there are radon out of your basement, etc. Yes, it costs a little bit of money but it can be used as a well lot, just like it has been used in the past. And it is just a personal desire not to use it as a well lot. . . . Now I am not 100 [percent] convinced on this radon deal, I might

Pursuant to General Statutes § 8-8, the plaintiff appealed from the board's decision to the Superior Court. The plaintiff contended, inter alia, that: (1) the board's decision was not supported by substantial evidence in that the denial of the variance deprived the land of all reasonable uses and, thus, the plaintiff had demonstrated unusual hardship; (2) the existence of high levels of radon in the well water had compelled the plaintiff to discontinue the well's use and, therefore, the hardship was not self-created; and (3) the denial of the variance was tantamount to an unconstitutional taking under the state and federal constitutions because it deprived the property of all reasonable use. Pursuant to § 8-8 (k), the plaintiff made a motion to introduce additional evidence in its appeal to the trial court because, under this court's decision in *Cumberland Farms, Inc.* v. *Groton*, 262 Conn. 45, 63, 808 A.2d 1107 (2002),[9] the board was not competent to find the constitutional facts necessary to decide the issue of whether the denial of the variance constituted an unconstitutional inverse condemnation of the property. The trial court, *Mintz, J.*, granted the motion.

At the hearings before the trial court, *Marano, J.*, the plaintiff presented testimony on the extent to which the denial of the variances had deprived the land of

add too, because I think that there's a lot of wells around Ridgefield and in private houses around here that have a lot of radon too, and in fact that is a phenomenon that is all over the country. And you used the word it is dangerous. Well, we have had all these neighbors that have been living in that neighborhood for years drinking that water and I haven't heard of every one of them coming down with lung cancer . . . ."

[9] In *Cumberland Farms, Inc.* v. *Groton*, supra, 262 Conn. 63–64, we concluded that zoning boards could not engage in fact-finding on constitutional issues and held: "A plaintiff who brings an inverse condemnation action may vindicate that right in the Superior Court, where the court hears evidence, finds facts and determines whether the action of a zoning board amounts to a practical confiscation." Id., 63. "[A] plaintiff is entitled to a de novo review of the factual issues underlying its inverse condemnation claim, unfettered by the board's previous resolution of any factual issues." Id., 69.

financial value. Specifically, the plaintiff called a residential real estate appraiser, George Christopher Bedell, to testify as to the value of the property as a buildable residential lot, which he opined was $260,000. Although Bedell testified that the property would have "[v]ery little value" if it was sold as a vacant lot with no option to build on it, he also testified that the scope of his appraisal was limited to residential use and that he had not appraised the property as a well lot, or for any other purpose. The plaintiff then called its president, Polizzi, to testify as to his decision to close the well due to the high level of radon in the water.[10] Polizzi also recounted his failed attempts to sell the property to owners of adjacent lots and to Aquarion Water, but indicated that he had obtained an offer of $210,000 from Sturges to purchase the property for the purpose of building a house.

The trial court dismissed the plaintiff's appeal in a memorandum of decision dated July 10, 2006. Because its review of the board's decision had revealed that the record contained statements by the board in support only of the board's first two stated reasons relating to lack of hardship and self-created hardship, the court determined that it would limit its consideration to those reasons. The court first noted that, in order to obtain a variance, the plaintiff was required to show unusual hardship and that, with the exception of when the appli-

[10] Polizzi offered the following testimony: One of the plaintiff's customers, who had cancer, had tested the water at some point in the 1990s and had brought to Polizzi's attention that there was a problem with the water. Polizzi's subsequent testing revealed that there were 102,000 picocuries per liter in the well water. Such a high level of radon was well above the "maximum" set by the federal environmental protection agency of 4000 picocuries per liter. Customers had called him and "cautioned [him] as to [the plaintiff's] legal liability if . . . this was to continue, and . . . encouraged [him] . . . to start remediating the problem." Polizzi thereafter contacted the state department of public health and the department of public utility control and obtained the necessary permission to connect to Aquarion Water's system and to discontinue the use of the plaintiff's well.

cation of regulations would so diminish the value of the property as to have a confiscatory effect, diminished property value or income was not relevant to that determination. With respect to the board's conclusion that the plaintiff had failed to show the unusual hardship necessary to obtain a variance, the court concluded that the plaintiff had not demonstrated that the board's denial of its variance application had deprived the property of any value. Specifically, the court concluded that the plaintiff had not demonstrated either the value— or lack thereof—if the land could not be used as a buildable lot, or the price for which the plaintiff was willing to sell the property to adjacent property owners. The court further concluded that the plaintiff had failed to show unusual hardship by relying only on financial considerations that did not greatly decrease or practically destroy the value of the property. Because the court concluded that the board's first reason was sufficient to support its decision, the trial court did not reach the board's second reason of self-created hardship. Accordingly, the trial court dismissed the plaintiff's appeal. The plaintiff then filed in the Appellate Court a petition for certification to appeal. Following that court's grant of certification, we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

On appeal to this court, the plaintiff first contends that the trial court improperly determined that the board's conclusions as to hardship were not arbitrary and capricious. Specifically, it contends that the rezoning in 1966 and its resulting restrictions on the plaintiff's property, as well as the toxicity of the well water, have, absent a variance, rendered the property useless. Second, the plaintiff contends that the trial court improperly dismissed its claim that the application of the zoning regulations constituted an unconstitutional taking of the property by virtue of inverse condemnation

because, for the same reasons as under its first claim, without a variance the land had no reasonable uses or value. For the reasons that follow, we disagree.

## I

The plaintiff first contends that the trial court improperly concluded that the board's determination that the plaintiff had not shown the unusual hardship necessary to grant a variance was supported by substantial evidence. In this respect, the plaintiff essentially contends that the unique constraints on its property as a result of the 1966 amendment to the zoning regulations, coupled with the serious radon related public health concerns that forced it to close the well, have deprived the property of any meaningful use, absent a variance. Because the plaintiff presented uncontroverted evidence before the board regarding these circumstances, it submits that the board's decision was arbitrary. In addition, the plaintiff contends that, because a variance allowing it to build a house on the property, consistent with the residential nature of the zone, would eliminate a permitted nonconforming use, i.e., the well, there exists a sufficient ground for granting the variance.[11]

The board contends that the record supports its findings that the well was still operable and that it was the plaintiff's choice to discontinue that use because the department of public health had issued only a *conditional* permit to abandon the well. It further asserts that the high radon levels in the raw water were not evidence that unhealthy radon levels were present in the water actually consumed by those in the neighborhood, and that Polizzi is not qualified to offer expert testimony

[11] We note that the plaintiff does not rely on the board's statement in its denial of the 1989 variance that it would reconsider the hardship calculus provided that the department of public health permitted the closing of the well. The board's 1989 decision, however, was not phrased in terms of an absolute commitment to grant the variance.

on this issue. Finally, the board contends that the plaintiff had failed to show that owners of abutting properties would not be interested in purchasing the property for less than the $275,000 price at which the plaintiff had offered it to them. See footnote 7 of this opinion.

Insofar as this claim requires us to review the factual findings of the board, we set forth the applicable standard of review. "In reviewing a decision of a zoning board, a reviewing court is bound by the substantial evidence rule, according to which, [c]onclusions reached by [the board] must be upheld by the trial court if they are reasonably supported by the record. The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the [board]. . . . The question is not whether the trial court would have reached the same conclusion, but whether the record before the [board] supports the decision reached. . . . If a trial court finds that there is substantial evidence to support a zoning board's findings, it cannot substitute its judgment for that of the board. . . . If there is conflicting evidence in support of the zoning commission's stated rationale, the reviewing court . . . cannot substitute its judgment as to the weight of the evidence for that of the commission. . . . The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given." (Internal quotation marks omitted.) *Vine* v. *Zoning Board of Appeals*, 281 Conn. 553, 559–60, 916 A.2d 5, on remand, 102 Conn. App. 863, 927 A.2d 958 (2007). As we previously have concluded, when a zoning board has given " 'a formal, official collective statement of reasons for its actions,' " the scope of our review is limited to determining "whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to

apply under the zoning regulations." *Harris* v. *Zoning Commission*, 259 Conn. 402, 420, 788 A.2d 1239 (2002).

The following principles of law relating to variances guide our inquiry. "A variance constitutes permission to act in a manner that is otherwise prohibited under the zoning law of the town." *Bloom* v. *Zoning Board of Appeals*, 233 Conn. 198, 206, 658 A.2d 559 (1995). "[T]he authority of a zoning board of appeals to grant a variance under General Statutes § 8-6 (3) requires the fulfillment of two conditions: (1) the variance must be shown not to affect substantially the comprehensive zoning plan, and (2) adherence to the strict letter of the zoning ordinance must be shown to cause unusual hardship unnecessary to the carrying out of the general purpose of the zoning plan." (Internal quotation marks omitted.) *Grillo* v. *Zoning Board of Appeals*, 206 Conn. 362, 368, 537 A.2d 1030 (1988); see also R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (2007) § 9:2, p. 239. "The hardship complained of must arise directly out of the application of the ordinance to circumstances or conditions beyond the control of the party involved. . . . Where the condition which results in the hardship is due to one's own voluntary act, the zoning board is without the power to grant a variance. . . . Where . . . the hardship arises as the result of a voluntary act by one other than the one whom the variance will benefit, the board may, in the sound exercise of its liberal discretion, grant the variance." (Citation omitted; internal quotation marks omitted.) *Vine* v. *Zoning Board of Appeals*, supra, 281 Conn. 561. While hardship will vary from case to case, we repeatedly have held that considerations of financial disadvantage—or, rather, the denial of a financial advantage—do not constitute hardship, unless the zoning restriction "greatly decreases or practically destroys [the property's] value for any of the uses to which it could reasonably be put . . . ." (Internal quotation marks omitted.) Id.; see also

*Grillo* v. *Zoning Board of Appeals*, supra, 369; *Carlson* v. *Zoning Board of Appeals*, 158 Conn. 86, 89–90, 255 A.2d 841 (1969).

We agree with the trial court that the board's conclusion that the plaintiff had not met its burden to show unusual hardship was supported by substantial evidence and was not arbitrary, capricious or illegal.[12] The plaintiff presented no expert testimony or other evidence to show that use of the well had to be discontinued because of high radon levels. Indeed, the plaintiff had no answers to board members' questions regarding whether the plaintiff could take measures to treat the level of radon in the raw well water or whether residents could treat the water themselves. We previously have stated that decision makers for an administrative body may not disregard competent expert testimony and rely, without more, on their own knowledge of "technically sophisticated and complex" issues on which they "have not been shown to possess expertise . . . ." *Feinson* v. *Conservation Commission*, 180 Conn. 421, 427, 429, 429 A.2d 910 (1980); see *Jaffe* v. *Dept. of Health*, 135 Conn. 339, 349–50, 64 A.2d 330 (1949) (questions that go "beyond the field of the ordinary knowledge and expertise" of trier of fact may require expert testimony); see also *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, 269 Conn. 57, 78 n.27, 848 A.2d 395 (2004); cf. *Allison* v. *Manetta*, 284 Conn. 389, 405, 933 A.2d 1197 (2007) ("[A]lthough expert testimony may be admissible in many instances, it is required only when the question involved goes beyond the field of the ordinary knowledge and experience of

[12] In light of our conclusion that there is no unusual hardship, it is unnecessary to reach the plaintiff's arguments regarding the first prong of the test for a variance, namely, that the proposed construction of a single-family house on the property would not substantially affect the comprehensive zoning plan because many of the lots in the area were also undersized and the proposed house complied with the one acre zoning requirements for setbacks and coverage.

the trier of fact. . . . The trier of fact need not close its eyes to matters of common knowledge solely because the evidence includes no expert testimony on those matters." [Internal quotation marks omitted.]). Similarly, in the present case, we cannot say that the board acted improperly in failing to accept the representations of Polizzi, a lay witness, regarding the technically complex issue of the treatability of certain levels of radon in well water and any attendant public health risks.

In the absence of such expert testimony, the board clearly was not required to accept the plaintiff's assertion that it had no choice but to close the well on the basis of public health and safety concerns. Given that the well—the main feature of the property for several decades—was still operational, there was certainly no proof that denial of the variance would practically destroy the value of the property for all reasonable uses. Thus, the plaintiff failed to prove that it could not continue to use the property as it had been used for many years: to supply water to the subdivision. Therefore, the trial court properly determined that the board's decision that the plaintiff had failed to meet its burden of proving unusual hardship was supported by the record.[13]

## II

We next turn to the claim that the plaintiff raised before the trial court that the board's denial of the variance constitutes an unconstitutional taking under the federal and state constitutions because the applica-

---

[13] Because we conclude that the board's first reason for denying the variance was not arbitrary and was supported by the evidence before it, we need not address the plaintiff's other contentions as to how the board abused its discretion, namely: (1) that any hardship was not self-created; and (2) that the elimination of a nonconforming use constitutes an independent ground to grant the variance. *Vine* v. *Zoning Board of Appeals*, supra, 281 Conn. 561–62.

tion of the regulation amounted to an inverse condemnation of the property. In this respect, the plaintiff contends that, because the only feasible use of the property is a single-family dwelling, the strict application of the zoning regulations has effected a taking of its property by depriving the property of all reasonable uses and reducing its value to virtually nothing. We reject this claim. As a preliminary matter, we note that, for this constitutional claim, we review the trial court's factual findings under a clearly erroneous standard and its conclusions of law de novo. See *Cumberland Farms, Inc.* v. *Groton,* supra, 262 Conn. 63–65.

We begin with the plaintiff's claim under the state constitution. "An inverse condemnation claim accrues when the purpose of government regulation and its economic effect on the property owner render the regulation substantially equivalent to an eminent domain proceeding." (Internal quotation marks omitted.) Id., 73. "[W]hether a claim that a particular governmental regulation or action taken thereon has deprived a claimant of his property without just compensation is an essentially ad hoc factual inquir[y]." (Internal quotation marks omitted.) *Gil* v. *Inland Wetlands & Watercourses Agency,* 219 Conn. 404, 406, 593 A.2d 1368 (1991). In contravention to article first, § 11, of the state constitution, "[a]n ordinance which permanently restricts the use of land for any reasonable purpose . . . goes beyond permissible regulation and amounts to practical confiscation. . . . Short of regulation which finally restricts the use of property for any reasonable purpose resulting in a practical confiscation, the determination of whether a taking has occurred must be made on the facts of each case with consideration being given not only to the degree of diminution in the value of the land but also to the nature and degree of public harm to be prevented and to the alternatives available to the landowner." (Citations omitted; internal quotation

marks omitted.) *Chevron Oil Co.* v. *Zoning Board of Appeals*, 170 Conn. 146, 151, 365 A.2d 387 (1976). Thus, an inverse condemnation occurs when either: (1) application of the regulation amounted to a practical confiscation because the property cannot be used for any reasonable purpose; or (2) under a balancing test, the regulation's application impermissibly has infringed upon the owner's reasonable investment-backed expectations of use and enjoyment of the property so as to constitute a taking. *Bauer* v. *Waste Management of Connecticut, Inc.*, 234 Conn. 221, 257–58, 662 A.2d 1179 (1995), on appeal after remand, 239 Conn. 515, 686 A.2d 481 (1996).

For the reasons set forth in part I of this opinion, in the present case, it is eminently apparent that application of the town's zoning regulations does not amount to a practical confiscation. All of the plaintiff's contentions regarding the use of the property are founded on its assumption that we have accepted its legal and factual predicate that the well no longer was a viable use for the property. As we have determined, however, that use was viable, and the board properly found that the plaintiff had failed to prove that it could not continue to use the property to provide water to the subdivision. Before the trial court, the plaintiff similarly failed to present any expert testimony on the extent of the public safety risk of the radon levels in the well, and essentially proffered the same testimony that Polizzi had given before the board as to the radon level in the raw water and as to federal and state guidelines that had yet to be adopted formally. In the absence of further evidence that the plaintiff was compelled to close the well, which is a particularly economically viable use of the land given the nature of the plaintiff's business,[14] it cannot

[14] This is not a typical case of practical confiscation wherein a regulation or regulatory decision has deprived "undeveloped land in its natural state" of all reasonable uses. See *Bauer* v. *Waste Management of Connecticut, Inc.*, supra, 234 Conn. 255. At the time of the upzoning, the land already was being used as a well lot, although the record does not reveal whether

credibly claim that the application of the town's regulations deprived the property of any reasonable use. See *Bristol* v. *Tilcon Minerals, Inc.*, 284 Conn. 55, 85–86, 931 A.2d 237 (2007) ("[the defendant] was not deprived of all reasonable and proper use of the property because the [contaminated] groundwater had no effect on its present mining-related activities and [the defendant] introduced no evidence that the property could not be marketed for residential development even if burdened by a stigma").

We next turn to the balancing test. Under this test, "[a] regulation does not constitute a compensable taking if it does not infringe on . . . [the] reasonable investment-backed expectations [of the owner]." *Bauer* v. *Waste Management of Connecticut, Inc.*, supra, 234 Conn. 257; see also *Gil* v. *Inland Wetlands & Watercourses Agency*, supra, 219 Conn. 410–14 (financial burden on owner may be measured by reasonable investment-backed expectations of owner for use of lot). When the plaintiff purchased the property in 1969, it was a well lot, and the plaintiff continued to use it as a well lot to supply water to the subdivision for twenty years thereafter before applying for its first variance in 1989. Although the plaintiff provided the board with a letter from one of the original owners stating that he always had intended for the lot to be used as a building lot at some point in the future, that letter does not bear on the *plaintiff's* expectations, and the plaintiff's protracted use of the well to benefit economically from the property undercuts any assertion that it ever had a reasonable investment-backed expectation that the property should be used as a building lot.[15]

all of the well equipment currently on the property was then in place.

[15] We recognize that the plaintiff's takings claim is not barred merely because it acquired title to the property *after* the upzoning that ultimately defeated its later variance applications. See *Palazzolo* v. *Rhode Island*, 533 U.S. 606, 630–32, 121 S. Ct. 2448, 150 L. Ed. 2d 592 (2001) (holding that "[an inverse condemnation] claim is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction," but, rather,

Moreover, even if we were to assume that there was a reasonable expectation that the plaintiff would be able to build on the property, the record lacks any basis to compare the property's value as a well lot to its value as a buildable lot. Although Polizzi testified that he had been unsuccessful in his effort to sell the property to the neighbors or to Aquarion Water for a price comparable to what he could get for the property if it was deemed buildable, the plaintiff presented no evidence of the actual appraised value of the property as a well lot. Thus, the plaintiff failed to establish a basis on which the trial court could assess the extent to which the strict application of the zoning regulations had diminished the value of the property.

The plaintiff's claim that the application of the zoning regulations constitutes an indirect taking under the federal constitution fails for the same reasons that its claim fails under the state constitution. See *Lucas* v. *South Carolina Coastal Council*, 505 U.S. 1003, 1027, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992) (compensatory taking if regulation "deprives land of all economically beneficial use," unless state can show that "proscribed use interests were not part of [owner's] title to begin with"); see also *Palazzolo* v. *Rhode Island*, 533 U.S. 606, 617, 121 S. Ct. 2448, 150 L. Ed. 2d 592 (2001) ("[w]here a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking may nonetheless have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with the reasonable investment-backed expectations, and the character of the government

"[t]he determination whether an existing, general law can limit all economic use of property must turn on objective factors, such as the nature of the land use proscribed"). Although the plaintiff was entitled to change its mind as to its use of the property from a well to some other use, it has not presented sufficient evidence to show that it had such a *reasonable* expectation prior to the board's denial of the variance.

action"). Because the plaintiff failed to establish either that it had been deprived of all beneficial use of the property or that it had been deprived of a reasonable investment-backed expectation, the trial court properly dismissed the plaintiff's inverse condemnation claim.[16]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[16] In light of our conclusion that the well is a reasonable and economically viable use, we do not reach the plaintiff's contentions that its inability to sell the property to abutting property owners or to Aquarion Water constitutes proof that there is a taking.