******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# ROBERT BARTON *v.* CITY OF NORWALK
## (SC 19671)

Rogers, C. J., and Palmer, Eveleigh, Robinson and Beach, Js.

*Syllabus*

The plaintiff B brought this action, alleging, inter alia, that the defendant city had inversely condemned a parcel of real property containing a partially leased building by taking, through the power of eminent domain, an adjacent parcel containing a parking lot used by the tenants of the subject property. Shortly after purchasing the subject property, B purchased the adjacent parcel in order to construct a parking lot. B subsequently began leasing portions of the building on the subject property to various residential and commercial tenants including, among others, a church. In 2002, the defendant condemned the adjacent parcel in order to build a police station and paid B $127,000 in compensation for the taking. The lack of available parking due to the condemnation of the adjacent parcel subsequently rendered the subject property undesirable to current and prospective tenants. Both the percentage of space leased and B's rental income subsequently declined. Thereafter, B filed an action in the Superior Court seeking review of the compensation afforded to him by the defendant for the condemnation of the adjacent parcel. The court found in favor of the plaintiff, determining that the adjacent parcel was worth $310,000 rather than $127,000. Because B could not recover for losses to the subject property in the previous action concerning the adjacent parcel, he subsequently commenced the present action alleging inverse condemnation of the subject property. The trial court concluded that the lack of parking resulting from the defendant's condemnation of the adjacent parcel precluded B from operating the building on the subject property as a leasable facility and, as a result, had substantially destroyed B's use and enjoyment of the subject property. In so concluding, the trial court rejected the defendant's claim that, in light of B's position in the previous action that the highest and best use of the adjacent parcel was as a mixed use development, the doctrine of judicial estoppel barred B from asserting, for the purpose of his inverse condemnation claim, that he would have continued using the adjacent parcel as a parking lot. The trial court rendered judgment in favor of B, from which the defendant appealed to the Appellate Court claiming, inter alia, that B had failed to make out prima facie case for inverse condemnation because the subject property retained significant value and that the trial court had incorrectly concluded that B's claim was not barred by the doctrine of judicial estoppel. The Appellate Court disagreed with these claims and, accordingly, affirmed the judgment of the trial court. The defendant, on the granting of certification, appealed to this court. *Held*:

1. The Appellate Court correctly determined that the defendant had inversely condemned the subject property by taking the adjacent parcel through the power of eminent domain: the trial court's conclusion that B's use and enjoyment of the subject property was substantially destroyed was amply supported by its factual findings that B faced extreme difficulty renting space due to the absence of parking and that the market value of the subject property had fallen by more than 80 percent; moreover, this court could not conclude, in light of declining lease rates and the lack of success in marketing, that the continued presence of the church, which had declined to renew its lease after the condemnation of the adjacent parcel, undermined the trial court's conclusions; furthermore, the fact that the subject property retained some economic value did not undermine the trial court's ultimate finding that B's use and enjoyment of the subject property was substantially destroyed.

2. The defendant could not prevail on its claim that the trial court abused its discretion by declining to bar B's inverse condemnation claim under the doctrine of judicial estoppel; the plaintiff's claim in the present action that he would continue to use the adjacent parcel as a parking lot was not clearly inconsistent with his position in the previous action that the highest and best use of the adjacent parcel was as a mixed use

development, as a property owner need not actually use his or her property in accordance with its highest and best use.

Argued January 19—officially released July 4, 2017

*Procedural History*

Action to recover damages for, inter alia, the defendant's alleged taking of certain of the plaintiff's real property by inverse condemnation, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Mintz, J.*, granted the plaintiff's motion to cite in Sonoson, LLC, as a party plaintiff; subsequently, the matter was tried to the court, *Hon. Taggart D. Adams*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment for the plaintiffs, from which the defendant appealed to the Appellate Court, *Gruendel*, *Prescott* and *Pellegrino*, *Js.*, which affirmed the judgment of the trial court, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Carolyn M. Colangelo*, assistant corporation counsel, with whom were *Mario F. Coppola*, corporation counsel, and *Daniel J. Krisch*, for the appellant (defendant).

*Elliott B. Pollack*, with whom, on the brief, was *Tiffany K. Spinella*, for the appellees (plaintiffs).

*Opinion*

EVELEIGH, J. In this certified appeal, the defendant, the city of Norwalk, appeals from the judgment of the Appellate Court affirming the judgment of the trial court awarding the plaintiff Robert Barton[1] $899,480 in damages plus prejudgment interest for his claim that the defendant inversely condemned a parcel of real property located at 70 South Main Street in Norwalk (70 South Main) by taking, through the power of eminent domain, the plaintiff's parking lot located across the street at 65 South Main Street (65 South Main). See *Barton* v. *Norwalk*, 163 Conn. App. 190, 193–94, 135 A.3d 711 (2016). The defendant raises two claims in the present appeal. First, the defendant claims that the Appellate Court incorrectly affirmed the judgment of the trial court that the plaintiff had proven inverse condemnation because 70 South Main retains significant value and generates significant income. Second, the defendant claims that the Appellate Court incorrectly concluded that the plaintiff's inverse condemnation claim was not barred by judicial estoppel. We disagree with the defendant and, accordingly, affirm the judgment of the Appellate Court.

The following facts and procedural history are relevant to the disposition of the present appeal. "In 1981, the plaintiff purchased the four story walk-up commercial building at 70 South Main as an office for his sail-making business. There was a single parking space at 70 South Main. The defendant told the plaintiff that he needed more parking for 70 South Main to comply with zoning regulations. The defendant approved a site plan for 70 South Main that involved the [plaintiff's purchase of] the vacant lot across the street at 65 South Main and creating forty-four parking spaces there. The plaintiff did so, and the defendant issued a certificate of zoning compliance in 1984 for both properties.

"In 1985, the plaintiff sold his sail-making business but kept the building. The buyers remained at 70 South Main for one year before moving out. When they did, the plaintiff began leasing space at 70 South Main to a number of commercial tenants. Lessees included a barbershop and a housing services office on the first floor, Macedonia Church on the second floor as well as parts of the third and fourth floors, a photo-gift business on the third floor, and several crafts persons on the fourth floor. The court did not expressly find but it is undisputed that there was also a residential apartment on the fourth floor. For most of the next fifteen years, the building was 95 to 100 percent occupied.

"When the plaintiff bought 70 South Main, there was abundant on-street parking nearby. Beginning in 1990, however, the defendant enlarged no-parking zones and converted several side streets into through streets. As a result, on-street parking grew steadily more limited.

In 1996, when the plaintiff learned of the defendant's interest in building a new police headquarters on land that included his parking lot at 65 South Main, he and his tenants grew concerned that they and their customers would have nowhere to park. They expressed this concern to city officials, who offered the plaintiff and his tenants forty parking permits at the South Norwalk train station, which would expire after ten years, as a compromise. The plaintiff and his tenants rejected this offer because they asserted that those spaces were far away, unpleasant, and possibly dangerous. The plaintiff stressed in his talks with two subsequent mayors of Norwalk that, if the defendant condemned his parking lot at 65 South Main, it would cripple operations at 70 South Main.

"In February, 2002, the defendant condemned the parking lot at 65 South Main and paid the plaintiff $127,000 as just compensation for it. . . . The plaintiff asked the Superior Court to review the defendant's statement of just compensation, arguing that 65 South Main was worth $350,000. . . . In addition, the plaintiff twice tried to amend his pleadings in that case to add a claim for losses to 70 South Main as a result of the taking of 65 South Main. The defendant successfully objected to both amendments.

"The parties' experts testified in that proceeding only to the fair market value of 65 South Main standing alone. . . . Specifically, both parties' real estate appraisers agreed that the highest and best use for 65 South Main, which is the standard measure of just compensation . . . would be a mixed use . . . .

"On January 27, 2009, the court rendered judgment in favor of the plaintiff in that case. The court found that 65 South Main was worth $310,000 as a mixed use development and awarded the plaintiff $310,000 in just compensation, minus the $127,000 that the defendant had already paid the plaintiff, plus interest, fees, and costs. . . .

"Because the plaintiff could not recover for losses to 70 South Main in the action concerning 65 South Main, he filed a second action—the subject of this appeal—in November, 2003, in which he alleged that the defendant had inversely condemned 70 South Main when it took 65 South Main. A four day trial to the court occurred in February, 2013. The plaintiff called four witnesses, namely, himself, his expert real estate appraiser, a former tenant of 70 South Main, and a current tenant of 70 South Main. The defendant chose to call no witnesses. Instead, when the plaintiff rested, the defendant moved for a judgment of dismissal on the ground that the plaintiff had failed to make out a prima facie case. After the court took that motion under advisement, the defendant rested without presenting a case-in-chief." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 194–97.

The trial court found that the lack of parking, caused by the taking of 65 South Main, had "substantially destroyed the [plaintiff's] ability to operate [70 South Main] as a leasable facility and enjoy even a modicum of financial success." More specifically, the trial court found that the lack of parking made the plaintiff's "chances of commercial success" at 70 South Main "negligible or nonexistent." The trial court concluded that this is a "close case," but nevertheless found that "the only evidence in this case is that 70 South Main has substantially depreciated in value, by [more than 80 percent], and this loss has been caused by the taking through eminent domain of the dedicated parking spaces [at 65 South Main]." On the basis of these findings, the trial court concluded that the defendant had inversely condemned 70 South Main because the taking of 65 South Main amounted to "a substantial destruction of the [plaintiff's] ability to enjoy or use [70 South Main] . . . ."

The trial court also rejected the defendant's judicial estoppel claim.[2] "The defendant had argued that the plaintiff was judicially estopped from bringing an action for the inverse condemnation of 70 South Main because (1) the plaintiff's position in the previous litigation that 65 South Main's highest and best use was as a mixed use development was 'completely inconsistent' with his position in this litigation that he would have continued using 65 South Main as a parking lot, and (2) his inconsistent positions gave him the unfair advantage of being able to bring the inverse condemnation action for losses to 70 South Main. The [trial] court disagreed, finding that the positions were consistent and that the plaintiff derived no unfair advantage." *Barton* v. *Norwalk*, supra, 163 Conn. App. 200–201.

Accordingly, "the court rendered judgment in favor of the plaintiff on his claim for the inverse condemnation of 70 South Main. The court awarded him $899,480 in damages plus $543,384.49 in prejudgment interest." Id., 197. The defendant appealed to the Appellate Court, which affirmed the judgment of the trial court.[3] See id., 219. This certified appeal followed.[4]

I

We begin with the defendant's claim that the Appellate Court incorrectly affirmed the trial court's judgment awarding monetary damages on a theory of inverse condemnation. The defendant claims that 70 South Main was not inversely condemned because it retained economic value, was approximately one half occupied, and continued to generate revenue. In response, the plaintiff claims that the Appellate Court properly affirmed the judgment of the trial court because the plaintiff's use and enjoyment of 70 South Main was substantially destroyed. We agree with the plaintiff.

"As a preliminary matter, we note that, for this constitutional claim [of inverse condemnation], we review the trial court's factual findings under a clearly erroneous standard and its conclusions of law de novo." *Rural Water Co.* v. *Zoning Board of Appeals*, 287 Conn. 282, 298, 947 A.2d 944 (2008).

"Inverse condemnation is a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency. . . . An inverse condemnation claim accrues when the purpose of government regulation and its economic effect on the property owner render the regulation substantially equivalent to an eminent domain proceeding . . . ." (Internal quotation marks omitted.) *Bristol* v. *Tilcon Minerals, Inc.*, 284 Conn. 55, 83, 931 A.2d 237 (2007). The government action must result in such a substantial interference with the use of the property that it "amounts to practical confiscation." (Internal quotation marks omitted.) *Rural Water Co.* v. *Zoning Board of Appeals*, supra, 287 Conn. 298. "Accordingly, an inverse condemnation action has been aptly described as an eminent domain proceeding initiated by the property owner rather than the condemnor." (Internal quotation marks omitted.) *Bristol* v. *Tilcon Minerals, Inc.*, supra, 83.

"The word taken in article first, § 11 of our state constitution[5] means the exclusion of the owner from his private use and possession, and the assumption of the use and possession for the public purpose by the authority exercising the right of eminent domain. . . . Although property may be taken without any actual appropriation or physical intrusion . . . there is no taking in a constitutional sense unless the property cannot be utilized for any reasonable and proper purpose . . . as where the economic utilization of the land is, for all practical purposes, destroyed. . . . A constitutional taking occurs when there is a substantial interference with private property which destroys or nullifies its value or by which the owner's right to its use or enjoyment is in a substantial degree abridged or destroyed." (Footnote in original; internal quotation marks omitted.) Id., 83–84. In other words, "Connecticut law on inverse condemnation requires total destruction of a property's economic value or substantial destruction of an owner's ability to use or enjoy the property." Id., 85.

The issue of whether there has been a substantial destruction of an owner's ability to use or enjoy a property—the basis for liability in the present case—is a fact intensive issue. See *Rural Water Co.* v. *Zoning Board of Appeals*, supra, 287 Conn. 298 ("[w]hether a claim that a particular governmental regulation or action taken thereon has deprived a claimant of his

property without just compensation is an essentially ad hoc factual inquir[y]" [internal quotation marks omitted]). There is no bright line standard. We have previously observed that "it may be difficult to determine in certain close cases whether the alleged infringement on property rights is sufficient to constitute the type of complete taking that inverse condemnation requires . . . ." *Bristol* v. *Tilcon Minerals, Inc.*, supra, 284 Conn. 85; see also *Washington Market Enterprises, Inc.* v. *Trenton*, 68 N.J. 107, 116, 343 A.2d 408 (1975) ("[t]he general question as to when governmental action amounts to a taking of property has always presented a vexing and thorny problem").

We recently observed, in a zoning variance case, that "[w]hen a reasonable use of the property exists, there can be no practical confiscation."[6] (Internal quotation marks omitted.) *Caruso* v. *Zoning Board of Appeals*, 320 Conn. 315, 323, 130 A.3d 241 (2016). Thus, when a putative condemnee fails to show that the property cannot be used for any reasonable and proper purpose, liability for inverse condemnation is precluded. See *Rural Water Co.* v. *Zoning Board of Appeals*, supra, 287 Conn. 298–300 (finding no inverse condemnation where landowner failed to show it could not continue to operate water utility on subject property); *Bristol* v. *Tilcon Minerals, Inc.*, supra, 284 Conn. 55 (finding no inverse condemnation where contamination from nearby city landfill did not prevent landowner from continuing to use land for mining operations or marketing land for residential development); *Sinotte* v. *Waterbury*, 121 Conn. App. 420, 437, 995 A.2d 131 (finding no inverse condemnation where landowners could still use home as residence despite periodic sewage backups), cert. denied, 297 Conn. 921, 996 A.2d 1192 (2010).

"Conversely, when the property retains no reasonable use or value under the zoning regulation, a practical confiscation occurs." *Caruso* v. *Zoning Board of Appeals*, supra, 320 Conn. 324. In *Caruso*, this court noted prior cases holding that compelling the use of large homes as single-family homes when it would be prohibitively expensive to maintain the homes as such would result in a practical confiscation. Id., 324–25, citing *Culinary Institute of America, Inc.* v. *Board of Zoning Appeals*, 143 Conn. 257, 260–61, 121 A.2d 637 (1956), and *Libby* v. *Board of Zoning Appeals*, 143 Conn. 46, 52–53, 118 A.2d 894 (1955). In *Libby*, the conclusion that the regulation amounted to a practical confiscation was sustained on the basis of the inability to market the property as a single-family residence. *Libby* v. *Board of Zoning Appeals*, supra, 52 ("[The property's] usefulness as a [single-family] house is gone. The extent to which its value has dropped is borne out by the inability to find, over a [two year] period, a single individual who was willing to make any offer for it.").

Against this legal background, we conclude that the

trial court properly found that the defendant inversely condemned 70 South Main in the present case. After the defendant took the parking lot at 65 South Main, the use of 70 South Main was substantially destroyed. This conclusion is amply supported by the trial court's findings of fact that the plaintiff faced extreme difficulty renting space at 70 South Main, which, in turn, resulted in a more than 80 percent diminution of its value.

At the outset of its analysis, the trial court highlighted the "serious, immediate, and enduring adverse effects" of the taking of 65 South Main on the marketability of 70 South Main. The court concluded that the lack of parking had rendered space at 70 South Main undesirable to prospective tenants. This was evidenced by the plaintiff's graph depicting a drop in leased space from 97 percent[7] in 2001, to 5 percent in 2006, with a slight increase to 10 percent in 2011. The Family and Children's Aid Society of Fairfield County, a prior tenant that had occupied three quarters of the ground floor, left at the end of its lease citing the lack of parking. Tenants on the third and fourth floor also departed at the end of their lease because of the lack of parking. The trial court noted the evidence presented about interest from prospective tenants who found the space attractive, but were dissuaded by the lack of parking. Lover Thomas, a barber who had run his business out of 70 South Main since 1989, attempted to endure the parking challenges. He suffered a loss of one quarter of his customers and ultimately closed shop, citing the lack of parking.[8]

As the tenants departed, the plaintiff was unable to replace them. After 65 South Main was taken, the plaintiff's real estate broker documented the interest of prospective tenants, interest that would not materialize into a lease principally due to the lack of parking.[9] In a letter, the broker informed the plaintiff that, without a solution to the lack of parking, "the future tenancy of 70 South Main . . . looks very bleak at present." In the intervening ten years from the taking of 65 South Main to the trial, the plaintiff managed to attract only two small tenants to lease space. One is a cell phone store and the other is a bail bondsman. The trial court found that the tenancy of the bail bondsman is the consequence of the unique situation that 70 South Main is located across the street from the police station. The cell phone store depends on walk-in clientele, and the owner himself walks to work. The trial court found that "the remainder of the building will attract tenants only by rock bottom rents, and these will be tenants for which parking is not an issue, likely a small and transient group."

As a result of the lack of marketability, the plaintiff struggled to maintain 70 South Main. When the plaintiff sought the necessary permits for certain maintenance services, he was rebuffed by the defendant's agencies

on the basis of the lack of parking. The trial court noted that "the record is replete with responses from municipal authorities that nothing can be done because of the parking issue and pending litigation." The trial court noted that, in order to keep costs down, at one point, the plaintiff's son lived in the building and furnished maintenance services. Indeed, as the trial court found, "[t]he evidence shows the lack of parking . . . reduced [70 South Main's] chances of commercial success to negligible or nonexistent."

The defendant claims that the trial court's finding with respect to the viability of the property is improper because it ignores the fact that Macedonia Church, which had leased space from the plaintiff since 1987 continued to occupy space in the building and generate substantial revenue. It is true that Macedonia Church occupied a substantial portion of the building—39 percent. Macedonia Church continued to occupy all of the second floor and parts of the third and fourth floor of the building through the date of the trial on a month to month basis. As a result of the its continued tenancy, the decline in operating income[10] was not as steep as the decline in term lease tenancy. The trial court found that the income declined from $94,080 in 2001 to $20,661 in 2006.

The defendant, however, glosses over significant facts regarding Macedonia Church's occupancy of 70 South Main. Although it enjoyed below market rents, once the parking lot was taken, Macedonia Church did not renew its lease with the plaintiff and informed the plaintiff that it intended to quit the premises when a suitable alternative was found. As an act of municipal grace, the defendant permitted Macedonia Church to use certain parking spaces on a nearby street at no cost. A leader from Macedonia Church testified that, if parking were not furnished, it would need to seek an alternative location on a temporary basis. As of the date of trial, the plaintiff had not found any new tenants for any of the spaces above the ground level. Thus, notwithstanding the length of Macedonia Church's continuing month to month occupancy, the plaintiff simply could not count on it as a revenue stream to continue to profitably operate the building long term. Therefore, we cannot conclude that, in light of the dismal lease rate and lack of success marketing vacant space, Macedonia Church's presence undermined the trial court's conclusion that the plaintiff's use and enjoyment of 70 South Main has been substantially destroyed.

The trial court's conclusion is also supported by its finding that the value of 70 South Main had fallen by more than 80 percent. In making its finding, the trial court "generally accept[ed]" the documentary and oral expert testimony of a commercial real estate appraiser, Michael McGuire. McGuire had thirty years of experience as a real estate appraiser, was a principal at a real

estate appraisal firm in Norwalk, and was "knowledge-able about real estate values and trends in the Norwalk area . . . ." McGuire had recent experience in dealing with parking rules in Norwalk.[11] On the basis of McGuire's report, the trial court found that the value of 70 South Main had diminished from $1.1 million to $200,520 or 81.77 percent.[12] McGuire attributed this decline in value to the absence of available parking. He testified that "parking is the lifeline of [a] building" in a suburban market. He added that when "[y]ou take the parking away, you've gutted . . . the value of a building." McGuire further testified that 70 South Main was "pretty close to teardown value." The appraisal report stated that, without available parking, the property may be worth less than if it were vacant and available for development.

We are not persuaded that the fact that 70 South Main retains some economic value undermines the trial court's conclusion that the plaintiff's use and enjoyment of the property was substantially destroyed. "Connecticut law on inverse condemnation requires total destruction of a property's economic value or substantial destruction of an owner's ability to use or enjoy the property." *Bristol* v. *Tilcon Minerals, Inc.*, supra, 284 Conn. 85. Logic dictates that where inverse condemnation is found for substantial—but not complete—destruction of an owner's ability to use or enjoy property, the remaining quantum of use or enjoyment will be reflected in some economic value. Where, as here, the plaintiff has shown that his use and enjoyment of property has been substantially destroyed, the taking is of constitutional magnitude and the plaintiff is entitled to just compensation for the inverse condemnation of his property. "[T]he usual measure of damages is the difference between the market value of the [property] before the taking and the market value of [the property] thereafter." (Internal quotation marks omitted.) Id., 71.

In sum, we conclude that the trial court properly concluded that the plaintiff had proven his theory of inverse condemnation in the present case.

II

We next turn to the defendant's claim that the plaintiff's inverse condemnation action was barred by the doctrine of judicial estoppel. The defendant claims the trial court incorrectly failed to find the plaintiff estopped from asserting that 70 South Main should be valued with the use of 65 South Main as a parking lot. Specifically, the defendant claims the following: (1) the plaintiff's position with respect to the use of 65 South Main is clearly inconsistent with his position in the previous eminent domain action, wherein he argued the highest and best use of 65 South Main was as mixed use development; (2) the trial court in the previous case adopted the plaintiff's position and awarded compensation on that basis; and (3) the plaintiff would derive an

unfair advantage against the defendant by taking such a position in the present case. We conclude that the defendant failed to prove that the plaintiff's claim was barred by judicial estoppel.

We begin by setting forth our standard of review of the defendant's claim. "Because the rule is intended to prevent improper use of judicial machinery . . . judicial estoppel is an equitable doctrine invoked by a court at its discretion . . . . Accordingly, our review of the trial court's decision not to invoke the doctrine is for abuse of discretion." (Citations omitted; internal quotation marks omitted.) *Assn. Resources, Inc.* v. *Wall*, 298 Conn. 145, 171, 2 A.3d 873 (2010).

"[J]udicial estoppel prevents a party in a legal proceeding from taking a position contrary to a position the party has taken in an earlier proceeding. . . . [J]udicial estoppel serves interests different from those served by equitable estoppel, which is designed to ensure fairness in the relationship between parties. . . . The courts invoke judicial estoppel as a means to preserve the sanctity of the oath or to protect judicial integrity by avoiding the risk of inconsistent results in two proceedings." (Internal quotation marks omitted.) *Dougan* v. *Dougan*, 301 Conn. 361, 372, 21 A.3d 791 (2011). The doctrine "protect[s] the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment . . . ." (Citations omitted; internal quotation marks omitted.) *New Hampshire* v. *Maine*, 532 U.S. 742, 749–50, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001).

Judicial estoppel applies if (1) "a party's later position is clearly inconsistent with its earlier position," (2) "the party's former position has been adopted in some way by the court in the earlier proceeding," and (3) "the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." (Internal quotation marks omitted.) *Dept. of Transportation* v. *White Oak Corp.*, 319 Conn. 582, 612, 125 A.3d 988 (2015); see *Dougan* v. *Dougan*, supra, 301 Conn. 372–73; see also *DeRosa* v. *National Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010). The application of judicial estoppel is further limited to "situations where the risk of inconsistent results with its impact on judicial integrity is certain." (Internal quotation marks omitted.) *Dougan* v. *Dougan*, supra, 373. In addition, generally speaking, the doctrine will not apply "if the first statement or omission was the result of a good faith mistake . . . or an unintentional error." (Internal quotation marks omitted.) Id.

With respect to the first element of judicial estoppel, the defendant claims that in the earlier eminent domain proceeding, the plaintiff took the position that the highest and best use of 65 South Main was as a mixed use development, whereas in the present case, 65 South Main was treated as a parking lot dedicated to use in

conjunction with 70 South Main for purposes of valuation. The defendant claims that the plaintiff's positions with respect to 65 South Main are clearly inconsistent. The plaintiff claims that the positions are not inconsistent because a person need not actually use property in accordance with its asserted highest and best use. We agree with the plaintiff.

When land is taken by the government, the landowner is entitled to just compensation. Conn. Const., art. I, § 11. It is by now axiomatic that "the condemnee shall be put in as good condition pecuniarily by just compensation as he would have been in had the property not been taken." (Internal quotation marks omitted.) *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 272 Conn. 14, 25, 861 A.2d 473 (2004). To achieve this, the landowner is compensated the fair market value of the property taken. Id. "In determining market value, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land . . . . The fair market value is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use." (Internal quotation marks omitted.) Id. The highest and best use of certain property is not necessarily the present use of the property. To the contrary, "[t]he highest and best use concept, chiefly employed as a starting point in estimating the value of real estate by appraisers, has to do with the use which will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate." (Internal quotation marks omitted.) Id. The law requires the court to "consider whether there was a reasonable probability that the subject property would be put to that use in the reasonably near future, and what effect such a prospective use may have had on the property's market value at the time of the taking." (Internal quotation marks omitted.) Id.

The defendant's claim in this case is a conflation of " 'value in use' " and " 'value in exchange.' " *Wellmark, Inc.* v. *Polk County Board of Review*, 875 N.W.2d 667, 673 (Iowa 2016). " 'Value in exchange' refers to the value to persons generally and focuses on market value based upon a willing buyer and willing seller. . . . 'Value in use' refers to the value a specific property has for a specific use. . . . Value in use is based upon the value of the property as it is currently used, not on its market value considering alternative uses." (Citations omitted.) Id. In a free society, there is no requirement that every property owner employ his property in its highest and best use. But the fact that a property owner chooses to put his property to less productive use does not necessarily result in a diminution of the market value of the property.[13] If someone were to use the newest model cell phone as nothing more than a paper

weight, no one would argue that in a competitive market the cell phone would be worth that of an idle paper weight. Because there would be a reasonable probability that a willing buyer would use the cell phone as intended—its highest and best use—rather than as a paper weight, its market value is the former rather than the latter, irrespective of its actual use. In valuing property, an asserted highest and best use is not a promise, but rather a means to ascertain fair market value. It is not inconsistent for a property owner to assert a particular use of property different from an asserted highest and best use of the property.

The fact that the plaintiff sought and proved a fair market value of 65 South Main as a mixed use development in the earlier eminent domain proceeding does not now preclude him from claiming, in the present case, that he would continue to use that property as a parking lot had it not been taken. This case is about the value of 70 South Main. In presenting his case, the plaintiff, through his expert, compared the value of 70 South Main with the use of 65 South Main as a parking lot with the value 70 South Main without the use of 65 South Main as a parking lot. The trial court found as fact, and the defendant did not challenge on appeal, that this analysis showed the damage 70 South Main incurred as a result of the defendant taking 65 South Main. The fact that the plaintiff asserts in the present case that he would have continued to use 65 South Main as a parking lot is not clearly inconsistent from his assertions in the earlier eminent domain action as to the fair market value of that property.[14] Accordingly, the trial court did not abuse its discretion in rejecting the defendant's judicial estoppel claim.

We conclude that the Appellate Court properly determined that the trial court correctly concluded that the defendant had inversely condemned 70 South Main when it took 65 South Main, and that the trial court did not abuse its discretion in rejecting the defendant's judicial estoppel claim.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] We note that Sonoson, LLC, is also a plaintiff in the present action. Barton was the owner of the property at issue at the time of the alleged taking and commenced the present action. Thereafter, Barton executed a quitclaim deed to the property in favor of Sonoson, LLC. Thereafter, Barton filed a motion to cite in Sonoson, LLC, as a party plaintiff, which was granted by the trial court. For the sake of convenience, we hereinafter refer to Barton as the plaintiff.

[2] At the trial court, the defendant asserted other special defenses and counterclaims, all of which were rejected. None of those claims are raised on appeal.

[3] The Appellate Court rejected the plaintiff's claim on cross appeal that the trial court incorrectly denied the plaintiff offer of compromise interest under General Statutes § 52-192a. *Barton* v. *Norwalk*, supra, 163 Conn. App. 219. The plaintiff has not appealed from the judgment of the Appellate Court on that issue.

[4] This court granted the defendant's petition for certification for appeal limited to the following issues: (1) "Did the Appellate Court properly affirm

the trial court's judgment awarding monetary damages based upon the theory of inverse condemnation when [70 South Main] retained significant value, was used for the same purpose as before the condemnation, and continued to generate substantial rental income?"; and (2) "Did the Appellate Court properly hold that the plaintiff's inverse condemnation action was not barred by the doctrine of judicial estoppel, given the inconsistent positions that he had taken on the use of the taken property?" *Barton* v. *Norwalk*, 321 Conn. 901, 901–902, 136 A.3d 1272 (2016).

[5] Article first, § 11, of the constitution of Connecticut provides: "The property of no person shall be taken for public use, without just compensation therefor."

[6] We have noted that the "same analysis" is applied in zoning variance cases as in inverse condemnation cases because "when the [zoning] regulation practically destroys or greatly decreases [the property's] value for any permitted use to which it can reasonably be put . . . the loss of value alone may rise to the level of a hardship." (Citation omitted; internal quotation marks omitted.) *Caruso* v. *Zoning Board of Appeals*, 320 Conn. 315, 323, 130 A.3d 241 (2016). Generally speaking, a landowner must show, inter alia, "unusual hardship" to be granted a variance. Id., 321. In order to meet this element of the legal standard for a variance, the landowner may demonstrate that "the zoning regulation has deprived the property of all reasonable use and value, thereby practically confiscating the property." Id., 322. Accordingly, we have observed that this places our variance cases "at the intersection of two related, yet distinct, areas of law: land use regulation and constitutional takings jurisprudence." (Internal quotation marks omitted.) Id. The unusual hardship test in zoning variance cases and the substantial destruction test in inverse condemnation cases require a showing that the property cannot be utilized for any reasonable purpose. Compare id., 323 ("we have continually held in variance cases that [w]hen a reasonable use of the property exists, there can be no practical confiscation" [internal quotation marks omitted]), with *Bristol* v. *Tilcon Minerals, Inc.*, supra, 284 Conn. 84 ("there is no taking in a constitutional sense unless the property cannot be utilized for any reasonable and proper purpose" [internal quotation marks omitted]); see also *Rural Water Co.* v. *Zoning Board of Appeals*, supra, 287 Conn. 299 (noting that landowner's inverse condemnation claim failed for same reasons as its claim of unusual hardship).

[7] The memorandum of decision recites that 87 percent of the building was under lease in 2001. The graph admitted into evidence recites the figure of 97 percent for 2001. Elsewhere in the memorandum of decision, the trial court states that "[r]ental space under lease fell from over 90 percent in 2001 . . . ." Because the trial court cited the graph as its source for the 87 percent figure and we find no other basis in the record for the conclusion that 87 percent of the building was under lease in 2001, we conclude that the 87 percent figure in the memorandum of decision was a typographical error.

[8] Thomas stated the following in a June, 2006 letter: "It just doesn't pay to open every day anymore. The neighborhood is better, and that should be good, but the parking situation has just killed us. . . . Nobody wants to pay a $15 or $25 fine to get a $12 haircut. . . . With all this, it is a struggle each month to stay current with the rent and other expenses, and I don't see the situation improving."

[9] Over the course of approximately 120 days in 2002, the broker fielded twenty to twenty-five inquiries regarding the space available at 70 South Main. The broker noted that the "primary and paramount issue" with respect to the spaces for these inquiries was the lack of on-site or nearby parking. Four potential tenants were shown space. Three of the potential tenants declined to enter a lease citing parking issues, while the fourth did not give a reason.

[10] According to the plaintiff's exhibit, "[o]perating [i]ncome is defined as [g]ross [r]ents received less [o]perating [e]xpenses. Operating [e]xpenses exclude mortgage interest and principal, depreciation, and capital improvements. Services provided 'in-kind' to the property are not reflected in [o]perating [e]xpenses."

[11] McGuire testified that he had recently served on a committee that examined parking in the area.

[12] The defendant notes in its brief that McGuire determined the before taking value of 70 South Main by applying valuation methodology that considered the use of 70 South Main and 65 South Main together and suggests that this method is inaccurate. At trial, however, the defendant declined to present any evidence with respect to the value of 70 South Main. Ultimately, the trial court credited McGuire's testimony and found that his analysis

provided a determination of the damage done to only 70 South Main. The defendant did not challenge the trial court's findings of fact on appeal. Our holding in the present case, therefore, should not be construed as an endorsement of the method used by McGuire to determine the before taking value of 70 South Main.

[13] The defendant's suggestion elsewhere in its brief that the before taking value of 70 South Main should be based upon the capitalization of the below market rent the plaintiff received from the Macedonia Church suffers from the same flaw.

[14] Because we conclude that the defendant failed to prove the first element of judicial estoppel, we need not discuss whether the defendant had satisfied the second and third elements.

———————————————————