******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# GERALD METALS, LLC, ET AL. *v.* CERTAIN UNDERWRITERS AT INTERNATIONAL UNDERWRITING ASSOCIATION OF LONDON
## (AC 46853)

Bright, C. J., and Suarez and Sheldon, Js.*

*Syllabus*

The plaintiff insureds appealed from the trial court's summary judgment for the defendant insurer on the plaintiffs' claim for a loss related to certain marine cargo insurance policies issued by the defendant. The defendant denied the plaintiffs' claim under the policies, which the plaintiffs filed after they were denied access to certain raw material they had purchased that was ultimately sold to a third party at a court-ordered auction in China. While the present case was pending before the Superior Court, the plaintiffs completed arbitration proceedings with the seller of the material. On appeal to this court, the plaintiffs claimed, inter alia, that the trial court improperly determined that they were collaterally estopped from relitigating the issues of whether the material was stolen and/or misappropriated or seized in light of the arbitrators' findings. *Held*:

The trial court properly concluded that, pursuant to the doctrine of collateral estoppel, the plaintiffs were precluded from arguing that the material was stolen or misappropriated and from disputing that the property was seized by Chinese government authorities, both issues having been actually and necessarily determined by the arbitrators in the arbitration proceedings.

The trial court properly granted the defendant's motion for summary judgment, as the court properly determined that no genuine issues of material fact remained as to whether the plaintiffs suffered "physical loss or damage" to the material within the meaning of the policies and that, in any event, the plaintiffs' alleged loss was subject to an exclusion for seizure contained in the policies.

Argued September 18, 2024—officially released March 25, 2025

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Hon. Charles T. Lee*, judge trial referee,

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

granted the defendant's motion for summary judgment
and rendered judgment thereon, from which the plain-
tiffs appealed to this court. *Affirmed.*

*Patrick F. Lennon*, with whom were *Steven R. Win-
ters* and, on the brief, *David S. Hardy* and *Damian K.
Gunningsmith*, for the appellants (plaintiffs).

*Thomas L. Tisdale*, with whom were *Jamison T.
Jedziniak* and, on the brief, *Timothy J. Nast*, for the
appellee (defendant).

*Opinion*

BRIGHT, C. J. This appeal arises from a dispute over
whether the plaintiffs, Gerald Metals, LLC, and Gerald
Metals S.A., suffered a covered loss to their insured
property under the marine cargo insurance policies
issued by the defendant insurer, Certain Underwriters
at International Underwriting Association of London.[1]
The plaintiffs appeal from the judgment of the trial
court, rendered following its granting of the defendant's
motion for summary judgment. On appeal, the plaintiffs
claim that the court improperly (1) determined that the
plaintiffs were collaterally estopped from relitigating
the issues of whether the insured property was stolen
and/or misappropriated and seized and (2) concluded
that there were no genuine issues of material fact as
to whether (a) the plaintiffs failed to demonstrate "phys-
ical loss or damage" under the policies and (b) the
loss was subject to the policies' seizure exclusion. We
disagree and, accordingly, affirm the judgment of the
trial court.

---

[1] At various points throughout this appeal and before the trial court, Gerald
Metals S.A. is alternatively referred to as Gerald Metals Sàrl or Gerald Metals
Sarl. It is undisputed that all refer to the same entity.

We note that, in various pleadings in the trial court, the defendant also
is referred to as Certain Underwriters Subscribing to Marine Cargo Insurance
Policy No. B07853PC1309890000 Effective November 1, 2013 to November
1, 2014.

The record reveals the following undisputed facts, viewed in the light most favorable to the plaintiffs, and procedural history. The defendant sold the plaintiffs a series of marine cargo insurance policies covering the period November 1, 2013, to October 31, 2016 (policies). The policies covered "goods and/or merchandise of every description consisting principally of Non-Ferrous Metals, Ores and Concentrates, Ferro Alloys, Mercury, Precious, Semi-Precious and Exotic Metals, Precious Metal Bearing Materials, in whatever form or shape, and all other goods and/or merchandise incidental to the business of the Assured consigned to or shipped by the Assured, or consigned to or shipped by others for the Assured's account or control, or in which the Assured may have an interest . . . ." (Emphasis omitted.) The "average terms and conditions" of the policies provided, inter alia, for coverage "[a]gainst all risks of physical loss or damage from any external cause including mysterious disappearance and infidelity of Assured's employees." The term "physical loss or damage" was not defined in the policies. The policies additionally included various warranties that excluded certain types of loss from coverage. One such warranty was the "[Free of Capture and Seizure] Warranty" (seizure exclusion) that provided in relevant part that "this insurance is warranted free from . . . capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences thereof or any attempt thereat, whether in time of peace or war and whether lawful or otherwise . . . ."

On or about December 13, 2013, the plaintiffs contracted to purchase 25,250 metric tons of alumina (material) from Shenzhen Shenhuo Trading Co., Ltd. (seller), a Chinese aluminum smelter. The material was previously shipped from the port of Bunbury, Australia, onboard the vessel M/V AS Elysia to the port of Qingdao, China (Qingdao port), where it was offloaded and

bagged in individual metric ton bags. The material was stored in a warehouse at the Qingdao port. The warehouse was controlled and operated by the Qingdao Port Group Co. Limited Dagang Branch (QPGC). The plaintiffs agreed to pay $9,090,000 by a letter of credit that would be released to the seller upon receipt of various documents, including an original warehouse receipt issued by CWT Commodities (CWT), a warehousing company in Qingdao, China. The contract provided that title to the material would pass to the plaintiffs free and clear of all liens and encumbrances upon receipt of the warehouse receipt (CWT warehouse receipt). The letter of credit was issued to the seller on December 23, 2013. On December 30, 2013, the plaintiffs were provided with confirmation that the seller had provided the required documents and, pursuant to the letter of credit, the funds were released to the seller. There was no physical delivery of the material. Rather, the material remained in the warehouse under the care of CWT.

On May 26, 2014, the plaintiffs gave CWT instructions regarding the release of the material in connection with a pending sale of the material. On June 4, 2014, CWT informed the plaintiffs that CWT was unable to release the material. Representatives of the plaintiffs arranged a site visit to the warehouse on June 7, 2014, to meet with CWT representatives but neither party was able to view the material or procure its release during the visit. On both September 15, 2014, and October 28, 2015, representatives of the plaintiffs again visited the warehouse and were able to view the material.

On January 15, 2015, the plaintiffs filed with the defendant a first notice of a claim for insurance coverage for loss of the material. On January 18, 2016, the defendant emailed the plaintiffs' broker, informing the broker that it was declining coverage of the plaintiffs' claim. The defendant's decision was based on a preliminary report produced by surveyors appointed by the defendant

(CSL report) on October 19, 2015, that provided that
"potentially the 25,250 [metric tons] [of material] is still
on site and remains under the detention of the Chinese
authorities." The defendant explained that, on the basis
of the findings from the CSL report and a review of the
policies, it believed coverage under the policies was
not available. Specifically, the defendant stated that it
did "not believe that being denied access to one's goods
warrant[ed] a recoverable claim" under the policies and
further referred to the policies' seizure exclusion, which
the defendant asserted directly affected whether the
claim was covered.

In response to the defendant's declination of cover-
age, on April 4, 2016, the plaintiffs sent the defendant
a claim report dated March 25, 2016, which described
the purchase history of the material and provided the
factual basis for the plaintiffs' claimed loss under the
policies. The report stated that during the September
15, 2014 and October 28, 2015 visits, representatives of
the plaintiffs observed a decreasing amount of material
identified as belonging to the plaintiffs. Specifically, the
report stated that their representatives observed "a total
loss of no less than 24,746 [metric tons] of [material]."
Further, the report provided that, during the September
15, 2014 visit, the representatives observed that the
paper tags marking the individual bags of material with
"AS Elysia" were either missing or faded beyond recog-
nition. During the October 28, 2015 visit, the paper tags
had been replaced with fabric tags with a different
vessel name, unaffiliated with the plaintiffs. The plain-
tiffs stated in their reply email to the defendants that
the "[c]laim [r]eport contradicts certain factual assump-
tions underlying the [defendant's] coverage position
which, in large part, are based on the CSL [report]" and
advised the defendant of its obligation to indemnify the
plaintiffs.

In light of the plaintiffs' claim report, the defendant's surveyors issued a second CSL report on July 20, 2016, summarizing their undertakings to verify the amount of material in the warehouse in relation to the plaintiffs' claim. The report stated that the surveyors were able to access only one of the two areas in the warehouse where the material was being stored and there was no equipment available to facilitate a proper count of the bags. Consequently, the surveyors concluded that they were unable to verify the loss of 24,746 metric tons of material. As a result, the defendant continued to refuse coverage for the plaintiffs' claim.

Thereafter, the plaintiffs brought the underlying action against the defendant on January 24, 2017. In their revised second amended complaint (operative complaint), filed on July 31, 2019, the plaintiffs asserted one count each of breach of contract (count one) and breach of the implied covenant of good faith and fair dealing (count two). In count one, the plaintiffs alleged that (1) under the policies, the defendant has an obligation to provide coverage for losses of insured goods and to pay the plaintiffs in the event of any such loss, (2) the loss resulted from the theft or misappropriation of the material and is covered under the policies, and (3) the defendant's refusal to pay constitutes a breach of contract. In count two, the plaintiffs alleged that the defendant "breached their duty of good faith and fair dealing by: (1) conducting a protracted and dilatory investigation into the loss; (2) . . . failing to adjust properly and promptly [the plaintiffs'] claim and inform [the plaintiffs] of their coverage position; (3) . . . placing their own interest ahead of that of their policyholders by drawing every inference in [the defendant's] favor and adversely to [the plaintiffs]; and (4) compelling [the plaintiffs] to seek to recover amounts due under the policies through litigation."

On June 1, 2021, the defendant filed an amended answer and special defenses in which it admitted to the issuance of the policies but denied or left the plaintiffs to their proof as to the remaining factual allegations. Specifically, the defendant denied that the plaintiffs had title to the material and that the material was stolen or misappropriated. The defendant raised fifteen special defenses, five of which were relevant to the defendant's summary judgment motion: (1) the loss alleged was not " 'physical loss or damage' " within the meaning of the policies, and therefore the claim was not covered; (2) the loss alleged "was the result of capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition, nationalization by the government or government-controlled entities of the People's Republic of China or other excluded reason" and, therefore, was excluded from coverage pursuant to the seizure exclusion contained within the policies; (3) there was no coverage because the warehouse receipts purporting to cover the material were fraudulently issued or otherwise the result of fraud, and thus there was no insurable interest to which insurance coverage attached; (4) the plaintiffs have not demonstrated a loss of the material, nor a physical loss, such as would be covered under the terms and conditions of the policies; and (5) the plaintiffs have not demonstrated title to the material.

After the parties had engaged in extensive discovery, the defendant filed a motion for partial summary judgment as to count two of the plaintiffs' complaint, which was denied by the court, *Hon. Kenneth B. Povodator*, judge trial referee, on August 17, 2020. Following additional motion practice and further discovery, the case proceeded to trial and a jury was selected. The court explained: "[Evidence in the trial] was ultimately scheduled to commence on Tuesday, November 15, 2022. . . . However, two days before the commencement of

[evidence], on Sunday afternoon, November 13, 2022, [the plaintiffs'] counsel sent [the defendant's] counsel an email enclosing [the plaintiffs'] Supplemental Response to Defendant's Interrogatory No. 8, dated October 16, 2017." The defendant's Interrogatory No. 8 was served on July 5, 2017. It requested that the plaintiffs identify "any legal proceedings relating to or concerning the material or insurance claim including but not limited to lawsuit(s), arbitration proceeding(s) or other dispute resolution forums to which the plaintiffs or their affiliates are or were parties anywhere in the world." In their initial response on October 16, 2017, the plaintiffs averred that "there are no other legal proceedings concerning the material or insurance claim to which the [plaintiffs] or their affiliates are or were parties anywhere in the world other than this current claim before the [Superior] Court of Connecticut." In their supplemental response, however, the plaintiffs "disclosed that, unbeknownst to [the defendant] or [the trial] court, [the plaintiffs] had been engaged in an arbitration before the London Metals Exchange ([arbitrators]) with the [seller] of the [material] at issue in [the underlying] case . . . since October 29, 2019. Because of the confidentiality of the [arbitration] proceedings, [the plaintiffs'] counsel refused to disclose further details without a court order.

"[The defendant] filed an emergency motion for sanctions on Monday, November 14, 2022 . . . which the court heard on Tuesday, November 15, 2022. The motion contended that the failure to disclose [the arbitration proceedings] was a flagrant violation of [the plaintiffs'] discovery obligations. [The defendant further] contended [that] it would be unfair to proceed to trial without full discovery of [the plaintiffs'] positions in the [arbitration] proceedings, especially because its holdings could constitute collateral estoppel and would be subject to judicial estoppel. While [the defendant]

sought dismissal or nonsuit against [the plaintiffs], it alternatively sought a mistrial. Further, [the defendant] sought discovery [concerning] the [arbitration] proceedings and an award of attorney's fees. . . .

"[At a November 15, 2022 hearing] [t]he court ordered [the plaintiffs] to immediately produce the third arbitration award handed down by the arbitrators on February 25, 2022, in the [arbitration] proceeding entitled *Gerald Metals Sarl* v. *Shenzhen Shenhuo Trading Co. Ltd.* (third award). At the continued hearing on November 18, 2022, the court heard further argument and, on November 21, 2022, issued an order . . . continuing the trial to dates in April, 2023, and discharging the jury. The order also directed the plaintiffs to produce by November 29, 2022, all filings in the [arbitration] proceedings and authorized limited depositions relating to those proceedings. It set a briefing schedule, subsequently modified, for the [defendant's] motion for summary judgment. The court reserved consideration of the defendant's motion for sanctions." (Citations omitted; footnote omitted.)

Thereafter, on January 24, 2023, the defendant filed a second motion for summary judgment, this time as to both counts of the plaintiffs' operative complaint. The defendant argued that, given certain positions taken by the plaintiffs in the arbitration proceedings and certain conclusions reached by the arbitrators, the plaintiffs' claims against the defendant were barred by collateral estoppel and/or judicial estoppel. In opposition to the defendant's motion, the plaintiffs argued that collateral estoppel did not bar their claims in the present case because the factual issues resolved in the arbitration were not identical to the factual issues underlying the present case. They further argued that, even if the issues in the arbitration and the present case were identical, those issues either were not actually decided in the arbitration or their resolution was not necessary to

the arbitration award. They also argued that judicial
estoppel did not apply because their positions in the
arbitration and in the present case were not inconsis-
tent, and, even if they were, the plaintiffs did not gain
an unfair advantage from, and the defendant was not
prejudiced by, the alleged inconsistency. Finally, the
plaintiffs argued that, even if certain facts were deemed
established due to the application of collateral estoppel
or judicial estoppel, there still remained disputed issues
of material fact that precluded summary judgment.

The following additional undisputed facts informed
the court's analysis of the defendant's motion. The
plaintiffs[2] served a notice of arbitration on the seller
on October 29, 2019. The notice alleged that the seller
had failed to "provide evidence of full title and prove-
nance" of the material. It further alleged that, after the
seller sold the plaintiffs the material, the plaintiffs were
"unable to remove [the material] from the bonded stor-
age area at the [Qingdao port] where it was offloaded
and stored . . . prior to [its] purchase" and "allowed
minimal access" to the material. The notice acknowl-
edged the ongoing Connecticut proceedings and the
plaintiffs' position therein that they had good title to
the material. The notice described the arbitration
demand as "protective" due to the seller's failure to
assist in demonstrating that title was properly and val-
idly passed to the plaintiffs. The notice claimed that,
in the event that the seller had failed to pass good and
unfettered title to the plaintiffs, the seller was in breach
of contract.

---

[2] We note that, although the third award only involves one claimant, Gerald
Metals, Sarl "(formerly Gerald Metals [S.A.])," the plaintiffs in this matter
are two related entities, Gerald Metals, LLC, and Gerald Metals S.A. For ease
of reference, we continue to refer to the plaintiffs collectively throughout
this opinion, as the parties have before the trial court and in their briefs
before this court.

The seller served a counter notice in response on November 26, 2019. A three arbitrator panel was constituted by December 5, 2019. After additional filings, the parties to the arbitration submitted their respective claim submissions and defenses between January and May, 2021, with amendments in September and October, 2021. In their submissions, the plaintiffs claimed that the seller was in breach of two terms implied into the purchase contract pursuant to section 12 of England's Sale of Goods Act 1979: the quiet possession term and the right to sell term. In relation to their quiet possession claim, the plaintiffs asserted that they had been unable to remove, obtain possession of, or sell the material. They contended that there were several separate breaches of the quiet possession term at various points in time.

Regarding their right to sell claim, the plaintiffs argued, inter alia, that the seller did not have the right to sell the material because the CWT warehouse receipt, with which the seller transferred title, was void. In support of this claim, the plaintiffs contended that a "warehouse receipt relating to the material with reference number ZJYY201304 bearing the date of [July 8, 2013] ([Rukudan]) was issued by QPGC to the order of CWT Commodities Shanghai Warehousing MGT Co. Ltd. (CWT Shanghai), an associate company of CWT." (Footnote omitted.) The plaintiffs alleged that the Rukudan was a fraudulent document, which rendered the CWT warehouse receipt that was issued in reliance on it void. Further, the plaintiffs argued that the CWT warehouse receipt was incapable of constituting constructive delivery because (1) the seller did not have title to the material and (2) the material was not in the possession of CWT, but in the possession of a third party (QPGC), which was not a party to the CWT warehouse receipt.

In its defense, the seller denied liability as to both claims. Addressing the quiet possession claim, the seller first argued that the claim was time barred. Further, the seller argued that, "as a matter of law, a seller is only liable if there is a supervening lawful intervention by a third party which is the seller's fault." The seller contended that it was not liable because the plaintiffs were denied the material due to specific unlawful events.

The seller also denied that it did not have the right to sell the material. The seller argued that the CWT warehouse receipt was "a document of title" and that, "by reason of the CWT [w]arehouse [r]eceipt . . . the [seller] and the [plaintiffs] each acquired title to the [m]aterial because under Chinese law, transfer of a warehouse receipt operates to transfer the right to possession of the goods and this right constitutes title to the goods." Moreover, the seller argued that, even if the Rukudan was forged or if title had not properly passed, each previous seller in the chain of title was a bona fide purchaser for value after the material had been delivered to the transferee by way of constructive delivery of the CWT warehouse receipt. Therefore, the previous seller, who sold the material to the seller, had the legal right to do so, and thereafter, the seller and then the plaintiffs became the legal owners of the material.

After the parties' submissions, a hearing took place before the arbitrators in London in November, 2021. The parties made several evidentiary proffers, including testimony from factual and expert witnesses. On February 25, 2022, the arbitrators issued the third award, in which they concluded that the seller did not have the right to sell the material, did not give the plaintiffs quiet possession of the material and, therefore, was in breach of contract. Before reaching the plaintiffs' claims, the arbitrators made the following factual findings as to

the disposition of the material. On January 20, 2014, the plaintiffs contracted to sell the material to Rio Tinto. Payment was made against the presentation of an irrevocable warehouse release. In preparation for this sale, CWT issued another warehouse receipt, dated January 22, 2014. The plaintiffs sought to arrange delivery of the material in May, 2014. On May 26, 2014, CWT was denied access to the material. The plaintiffs were informed of this denial of access in early June.

By late May, an investigation into fraud relating to certain aluminum and copper products stored at the Qingdao port was underway and access to the Qingdao port was limited. On June 3, 2014, CITIC, a mining company that contended that it owned the material, obtained preservation orders[3] from the Qingdao Maritime Court for the material. CITIC claimed that it purchased the material after it had arrived in the warehouse and that it held a warehouse receipt in relation to it, issued by one of the parties in the purported chain of title.[4] On June 6, 2014, Qingdao Port International Co. issued a public announcement about the investigation that stated that, on June 3, 2014, QPGC was asked to assist in the enforcement of preservation orders. On June 7, 2014, representatives of the plaintiffs visited the Qingdao port but were unable to view, access, or procure release of the material. On July 14, 2014, the police closed the Qingdao port. Thereafter, two separate proceedings in two different Chinese courts commenced. On August 24, 2014, CWT Shanghai commenced civil proceedings on behalf of the plaintiffs before the Qingdao Maritime Court against QPGC as

---

[3] We note that, throughout the third award, the arbitrators refer to the June, 2014 orders of the Qingdao Maritime Court as both sequestration orders and preservation orders. For ease of reference, we refer to the orders as preservation orders.

[4] Thereafter, on December 1, 2014, "CWT filed an Objection to Preservation of Property with the Qingdao Maritime Court in connection with the preservation order obtained by CITIC."

the "depository" of the material to obtain delivery of
the material. In 2019, the court issued a judgment in
which it found that CWT Shanghai failed to show that
it had a warehousing contract with the QPGC. In 2017,
criminal proceedings were brought against the alleged
perpetrators of the fraud at the Qingdao port. In 2018,
the Qingdao Intermediate People's Court found those
defendants guilty of issuing multiple fraudulent docu-
ments in relation to the same material. Thereafter, the
court ordered that "goods . . . that are seized or
impounded on record will be auctioned. . . . The crim-
inal evidence articles transferred with the case [(which
included the material)] are confiscated according to
law." (Emphasis omitted; internal quotation marks
omitted.) Pursuant to this order, on April 11, 2020, the
material was sold to a third party at auction.

On the basis of these factual findings, the arbitrators
rejected the seller's argument that it was not liable for
breaches of the plaintiffs' quiet possession because the
plaintiffs were denied the material due to specific
unlawful events: (1) the theft and/or misappropriation
of the material, (2) the unlawful action of QPGC denying
delivery of the material, and (3) the unlawful auction
of the material. The arbitrators concluded that the mate-
rial was not stolen or misappropriated. They further
concluded that they "were unable to accept that either
the action of the QPGC or the auction were unlawful.
QPGC could not deliver the [m]aterial because it had
been seized and confiscated by the police and subse-
quently by order of the [Qingdao Intermediate People's
Court]. The auction was conducted at the order of the
[Qingdao Intermediate People's Court]." Consequently,
because the breaches of the plaintiffs' quiet possession
identified by the seller all emanated from Chinese court
orders and, thus, were lawful, the arbitrators concluded
that the seller was legally responsible for breach of the
plaintiffs' quiet possession and therefore was in breach

of contract. The arbitrators also rejected the seller's
argument that the plaintiffs' quiet possession claim was
time barred, finding that "there were independent
causes of action [for breach of quiet possession]
between 2013 and 2020." The arbitrators identified
those breaches as including when "CITIC obtained its
preservation order; the police seized the [m]aterial; the
[plaintiffs] [were] unable to obtain possession from the
QPGC; the [plaintiffs] [were] unable to clear customs;
and . . . the [m]aterial was sold at auction so that pos-
session was no longer available." Given these findings,
the arbitrators concluded that the quiet possession
claim was not time barred and succeeded on the merits.

The arbitrators then addressed the plaintiffs' right to
sell claim. Before addressing the merits of the claim,
the arbitrators first noted that their conclusion as to
the plaintiffs' success on the quiet possession claim
rendered their consideration of the plaintiffs' right to
sell claim "unnecessary." Nevertheless, the arbitrators
reasoned that, "given the time taken and evidence
adduced during this arbitration in dealing with this
claim, and should this matter go further, we consider
it next." The arbitrators noted that "[t]he essence of the
[r]ight to [s]ell claim was whether the CWT [w]arehouse
[r]eceipt was a valid warehouse receipt and if so,
whether transfer of it transferred title in the goods in
respect of which it had been issued." The arbitrators
ultimately concluded that, for the reasons argued by
the plaintiffs in their submissions, the CWT warehouse
receipt was not a valid warehouse receipt because,
among other reasons, CWT was not a depositary, and
"[o]nly a depositary can issue a warehouse receipt."
Accordingly, the arbitrators concluded that "[t]he
[seller] did not have the right to sell the [m]aterial and
did not give the [plaintiffs] quiet possession. It was
therefore in breach of the [c]ontract." The arbitrators

awarded the plaintiffs $9,090,000 with interest at the rate of 4.5 percent per annum.

On the basis of the findings and conclusions in the third award, the defendant argued in its motion for summary judgment in the present action that, pursuant to the doctrines of collateral estoppel and judicial estoppel, the plaintiffs cannot establish a prima facie case of insurable loss under the policies. Specifically, the defendant argued that the plaintiffs are estopped from disputing the following facts: (1) the plaintiffs never had title to the material; (2) at all relevant times, beginning in June, 2014, the material was seized or detained by the Chinese government; (3) the material was not stolen or misappropriated at any time; and (4) in April, 2020, the material was sold at public auction by order of the Qingdao Intermediate People's Court. Thus, the defendant argued that, when barred from relitigating these facts by collateral or judicial estoppel, the plaintiffs are unable to establish a prima facie case, as coverage is limited to all risks of "physical loss or damage" to the plaintiffs' property, which cannot occur if the plaintiffs never owned the material, and the policies contain a seizure exclusion, which excluded coverage here. The defendant further asserted that the court should award sanctions against the plaintiffs for the defendant's reasonable attorney's fees and costs incurred following February 22, 2022, the date of the third award. On February 3, 2023, the defendant filed a notice of supplemental authorities in further support of its motion for summary judgment in which it noted three then recently published decisions from both the United States Court of Appeals for the Second Circuit and the Connecticut Supreme Court that involved the issue of "physical loss or damage" in relation to property and marine cargo insurance policies. In summarizing these cases, the defendant argued that they all generally stand for the proposition that mere deprivation of use of property or

loss of access to property does not constitute "physical
loss or damage."

On February 21, 2023, the plaintiffs filed a memorandum of law in opposition to the defendant's motion for
summary judgment. The plaintiffs argued that summary
judgment was inappropriate here as (1) the doctrines
of judicial and collateral estoppel are not applicable in
this case and (2) there remain numerous outstanding
issues of material fact. The plaintiffs also addressed the
defendant's supplemental authorities notice, arguing
that it "raises an entirely new issue that has ultimately
no bearing on the instant matter." Nonetheless, they
argued that reliance on such authorities was misplaced
as the facts in those cases are distinguishable from
those in the present case.

On March 1, 2023, the defendant submitted a reply
to the plaintiffs' opposition, in which it asserted that
"[n]owhere [do the plaintiffs] raise any issues of fact
once the estopped facts are deemed admitted . . . ."
The defendant argued that, "[s]ince no other evidence
has been supplied by [the plaintiffs] to establish the
loss of the material, summary judgment is appropriate."

On March 22, 2023, the trial court, *Hon. Charles T.
Lee*, judge trial referee, heard oral argument on the
motion for summary judgment.[5] On August 10, 2023,

---

[5] At the March 22, 2023 hearing, the plaintiffs' counsel requested leave to
submit additional briefing on the specific issue of the "adoption" requirement
of judicial estoppel. See *Barton* v. *Norwalk*, 163 Conn. App. 190, 202–203,
135 A.3d 711 (2016) ("[t]ypically, judicial estoppel will apply if . . . the
party's former position has been adopted in some way by the court in the
earlier proceeding" (internal quotation marks omitted)), aff'd, 326 Conn.
139, 161 A.3d 1264 (2017). Thereafter, the court entered an order granting
the plaintiffs' request. On April 6, 2023, the plaintiffs filed their supplemental
memorandum of law, in which they further argued that the doctrine of
judicial estoppel did not apply because (1) the plaintiffs did not deceive the
arbitrators, (2) the plaintiffs' positions before the arbitrators and the trial
court were not irreconcilable, and (3) there was no unfair advantage to be
derived and equity weighed against applying judicial estoppel. The defendant
filed a memorandum in response on April 14, 2023, in which it noted that
the plaintiffs failed to address the specific issue of adoption. The defendant

the court issued a memorandum of decision granting the defendant's motion for summary judgment. The court concluded that, pursuant to the doctrine of collateral estoppel, the plaintiffs were estopped from arguing that the material was stolen, that the plaintiffs had title or possession of the material, and that the material was not seized. The court also concluded that the plaintiffs were judicially estopped from asserting positions clearly inconsistent with their arguments in the arbitration proceedings. Finally, the court concluded that (1) the plaintiffs were unable to establish a prima facie case for coverage under the policies because (a) they failed to demonstrate an insurable interest and (b) the claim did not involve "physical loss or damage"; and (2) even if there was loss within the meaning of the policies, the seizure exclusion excluded the loss from coverage based on the arbitrators' finding that the material was seized. This appeal followed. Additional facts and procedural history will be set forth as necessary.

On appeal, the plaintiffs claim that the court erred in rendering summary judgment because it improperly concluded that the doctrine of collateral estoppel applied to the issues of title, theft and seizure.[6] They further argue that, assuming that the court properly found that the plaintiffs were collaterally estopped from arguing that the material was stolen and/or misappropriated and not seized, "there [are] genuine issue[s] of material fact as to whether the [material] suffered 'physical loss or damage' within the meaning of the [policies] based on the [material] being inaccessible to [the plaintiffs]" and "whether the loss was excluded by the [seizure exclusion]."

further responded to each of the plaintiffs' supplemental arguments and argued that the court should render summary judgment in its favor.

[6] The plaintiffs also claim that the trial court improperly concluded that the doctrine of judicial estoppel applied and precluded the plaintiffs from relitigating those same issues. Given our conclusion herein that the trial court properly applied collateral estoppel, we need not reach the plaintiffs' claim as to judicial estoppel.

Before addressing the plaintiffs' claims, we note the applicable standard of review. "Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . . [T]he scope of our review of the trial court's decision to grant the [defendant's] motion for summary judgment is plenary. . . . Additionally, the applicability of the doctrine of collateral estoppel presents a question of law, over which this court's review is also plenary." (Citation omitted; internal quotation marks omitted.) *Doyle* v. *Universal Underwriters Ins. Co.*, 179 Conn. App. 9, 13–14, 178 A.3d 445 (2017).

## I

We first turn to the plaintiffs' claim that the trial court improperly applied the doctrine of collateral estoppel to the issues of whether the material was stolen and/or misappropriated and seized. Specifically, the plaintiffs argue that the issues of theft and seizure addressed in the third award were not necessarily determined by the arbitrators nor are they identical to the issues in the present case.[7] We disagree.

---

[7] The plaintiffs do not challenge the trial court's conclusion that the other two factors of collateral estoppel, that the issues were fully and fairly litigated and actually decided, were satisfied. Consequently, we confine our review to whether the issues are identical between proceedings and were necessarily determined.

We begin by setting forth the general principles regarding the law of collateral estoppel. "[C]ollateral estoppel precludes a party from relitigating issues and facts actually and necessarily determined in an earlier proceeding between the same parties or those in privity with them upon a different claim. . . . An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined. . . . An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered. . . . To assert successfully the doctrine of issue preclusion, therefore, a party must establish that the issue sought to be foreclosed actually was litigated and determined in the prior action between the parties or their privies, and that the determination was essential to the decision in the prior case. . . . For collateral estoppel to apply, the issue concerning which relitigation is sought to be estopped must be identical to the issue decided in the prior proceeding." (Citation omitted; internal quotation marks omitted.) Id., 14–15.

Thus, "[t]o establish [that] collateral estoppel applies, the court must determine what facts were necessarily determined in the first trial, and must then assess whether the [party] is attempting to relitigate those facts in the second proceeding." (Internal quotation marks omitted.) *Aetna Casualty & Surety Co.* v. *Jones*, 220 Conn. 285, 297, 596 A.2d 414 (1991). "If an issue has been determined, but the judgment is not dependent [on] the determination of the issue, the parties may relitigate the issue in a subsequent action. Findings on nonessential issues usually have the characteristics of dicta." (Internal quotation marks omitted.) *Torrington Tax Collector, LLC* v. *Riley*, 226 Conn. App. 211, 227, 318 A.3d 267, cert. granted, 350 Conn. 909, 323 A.3d 1093 (2024).

"[O]rdinarily a factual determination made in final
and binding arbitration is entitled to preclusive effect.
. . . Thus, a court properly may grant summary judg-
ment on the ground that the plaintiff's claims are barred
by the doctrine of collateral estoppel on the basis of a
prior arbitration award." (Citations omitted; footnote
omitted; internal quotation marks omitted.) *Doyle* v.
*Universal Underwriters Ins. Co.*, supra, 179 Conn.
App. 15–16.

In the present case, the plaintiffs argue that "[a]ny
determination by the [arbitrators] of the issues of theft,
title or sale were not necessary to its award in [the
plaintiffs'] favor on [their] claim against the seller of
the [material] for breach of the sale contract based on
the latter's breach of the implied covenant of quiet
possession. . . . The only finding by the [arbitrators]
in [the plaintiffs'] favor that was necessary to support
the [third award] was that [the plaintiffs were] deprived
of possession of the [material] starting in 2013 and
thereafter. . . . The trial court erred by failing to deter-
mine that such findings were not mere dicta entitling
[the plaintiffs] to 'relitigate' such issues in the [present
case]." (Footnote omitted.) For its part, the defendant
argues, as the trial court concluded, that "[the issues]
were actually and necessarily decided by the [arbitra-
tors] because [they] needed to determine what hap-
pened to the [material] in order to render [their] deci-
sion . . . ." (Internal quotation marks omitted.) We
agree with the defendant.

We first note that, contrary to the arguments in their
appellate briefs, counsel for the plaintiffs conceded dur-
ing oral argument before this court that the issue of
whether the plaintiffs ever held title to the material was
actually and necessarily decided by the arbitrators. This
concession was consistent with their stated position in
their opposition to the defendant's motion for summary

judgment, in which the plaintiffs wrote that they "concede that the issue of title was actually and necessarily decided as part of the [arbitration] . . . ." In light of this concession, we confine our plenary review of the third award to the issue of whether the disposition of the material, i.e., whether it was stolen and/or misappropriated or seized from the plaintiffs, was essential to the arbitrators' conclusion that the seller was liable for breach of quiet possession. In the third award, the arbitrators explained that under the applicable law, England's Sale of Goods Act 1979, "the seller can be liable for breach [of the implied warranty of quiet possession] if the buyer's quiet possession is interrupted by the lawful acts of a third party. . . . [T]he seller can be liable for breach if the buyer's quiet possession is interrupted by the unlawful acts of a third party where there is connivance of the seller . . . ."[8] (Emphasis omitted.)

In their closing submissions to the arbitrators, the plaintiffs offered multiple theories for breach of quiet

---

[8] The plaintiffs also claim that "the trial court neither sought nor received any evidence on English law, or what determinations the [arbitrators] [were] required to make in order to rule in [the plaintiffs'] favor on [their] breach of contract claim. It was incumbent upon the trial court to ensure that the [arbitrators'] findings that the [material] was not stolen and that it was seized by Chinese authorities and sold at auction were—as a matter of English law—necessary to its award in [the plaintiffs'] favor and against the seller on [the plaintiffs'] claim for breach of the implied warranty of quiet possession. The trial court erred by failing to determine that such findings were not mere dicta entitling [the plaintiffs] to 'relitigate' such issues in the [present case]." The plaintiffs ignore the arbitrators' clear articulation of the relevant law, which, as discussed further in this opinion, explains why their determination of the disposition of the material was necessary. Moreover, in their opposition to the defendant's motion for summary judgment, the plaintiffs failed to provide any analysis of the applicable English law in opposition to the defendant's motion for summary judgment and likewise have failed to provide such analysis in their appellate briefs. Thus, to the extent that they attempt to rely on this claim, it is not adequately briefed. "Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Gilmore*, 289 Conn. 88, 124, 956 A.2d 1145 (2008).

possession, including the failure to provide the plaintiffs with good title to the material and the seizure of the material by Chinese authorities. Specifically, the plaintiffs claimed that "[t]here are a number of separate breaches at various points in time arising from the CITIC preservation order; the police seizure; the inability [of] [the plaintiffs] to obtain possession from QPGC; the inability [of] [the plaintiffs] to clear customs; and ultimately the sale of [the plaintiffs'] material at auction, so that the material is no longer available. Each of these gives rise to a breach of the quiet possession term. . . . In addition, on the basis that [the plaintiffs are] right that [they] never received title to the material, [they] obviously did not receive quiet possession either." In their points of claim before the arbitrators, the plaintiffs asserted that, to the best of their knowledge and belief, "such of the material (possibly all of it) as had not gone missing prior to the auction was sold in the auction."

In response, the seller denied liability and "contend[ed] that the cause of action was time-barred, but that in any event, there was no breach of this implied term because as a matter of law, a seller is only liable if there is a supervening lawful intervention by a third party which is the seller's fault. . . . [T]he [plaintiffs] did not get possession of the [m]aterial through no fault of the [seller] and the interventions were unlawful."

In resolving the quiet possession claim, the arbitrators first addressed the issue of whether the material was stolen and/or misappropriated. The seller claimed that the material was stolen between June 7, 2014, and October, 2015, and that this theft constituted an unlawful interruption in quiet possession for which the seller would not be liable. The arbitrators found that "[t]he [m]aterial was still in the [p]ort area at the time of the auction. It had not been stolen or misappropriated." They instead concluded that the material had been seized by the Chinese government. The arbitrators

found that "access to the [p]ort was restricted from the end of May 2014 because CWT complained that from [May 26] 2014, it had been denied access. By then the police investigation had started. On [June 3] 2014, [CITIC] obtained its preservation order [from the Qingdao Maritime Court]. Although there are conflicting accounts it does appear that the [plaintiffs or] CWT [were] given access on [June 7] 2014 and saw the [m]aterial. On [June 6, 2014], i.e. the day before, the [p]ort issued a public announcement that there was an investigation and that [QPGC] had been asked to assist with [the preservation] orders. On [July 14] 2014 the [p]ort was closed by the police. All of these facts paint a picture that access to the [p]ort was difficult and goods were sealed and subject to investigation and court preservation orders. That was still the state of affairs up until [October 28] 2015 when [the plaintiffs' employee] found only 504 [metric tons of material] and beyond then, right through to the date of auction in April 2020."

These findings are not merely passing commentary. Rather, the issue of whether the material was stolen and/or misappropriated was presented to the arbitrators by the seller as a defense to liability and the arbitrators addressed it in the third award to decide whether the seller breached the implied warranty of quiet possession. Further, the plaintiffs had an opportunity to litigate before the arbitrators, and did litigate, in favor of a finding that the material was never delivered to them and neither was stolen nor misappropriated but rather had been seized and then auctioned off in its entirety. Consequently, we conclude that the issue of whether the material was stolen and/or misappropriated was necessarily determined by the arbitrators in the third award.

Likewise, the issue of whether the material had been seized was also necessarily determined in the arbitration because it was essential to the seller's defense

that it was not liable because any actions depriving the plaintiffs of quiet possession were unlawful. The arbitrators concluded that, "[w]e were unable to accept that either the action of the QPGC or the auction were unlawful. *QPGC could not deliver the [m]aterial because it had been seized and confiscated by the police and subsequently by order of the [Qingdao Intermediate People's Court].* The auction was conducted at the order of the [Qingdao Intermediate People's Court]. Those acts were therefore conducted under the aegis of the Chinese courts. It is difficult to understand how they could therefore be unlawful." (Emphasis added.) Thus, the fact that the material was seized by Chinese authorities was essential to the arbitrators' determination that the interventions alleged by the seller to be unlawful (the denial of possession and the auction) were in fact lawful, which, in turn, was essential to the conclusion that the seller was liable.

The plaintiffs contend that "[t]he ultimate disposition of the [material] did not matter because the [arbitrators] made clear in the [third award] that the decision holding the seller liable to [the plaintiffs] for breach of the implied warranty of quiet possession was based on its finding that [the plaintiffs'] right to quiet possession had been interrupted in some manner." They argue that, because the arbitrators agreed with the plaintiffs that there were " 'different breaches of the implied warranty [of quiet possession] at various different times' . . . what happened to the [material] in the succeeding seven year period, i.e., seizure, auction, etc., was not necessary to the [arbitrators'] finding in [the plaintiffs'] favor on its breach of contract claim against the seller." In particular, the plaintiffs note that the third award acknowledges these other breaches, stating that "there were . . . different breaches of the implied warranty at various different times, starting with, at the earliest late 2013 when the CWT [w]arehouse [r]eceipt was

transferred to the [plaintiffs], but ending with the latest when the [m]aterial was finally sold at auction in April 2020 because at that point the [m]aterial was irrevocably no longer available. There were other breaches in between, such as in mid-2014 when the [p]ort was closed and the ongoing impossibility for the [plaintiffs] to obtain possession. Thus, there were independent causes of action between 2013 and 2020." We are not persuaded.

The plaintiffs' argument too narrowly construes the third award. Underlying the breach of quiet possession claim in the third award were two necessary facts: first, the material was not stolen or misappropriated, and second, the material was seized by agents of the Chinese government. Moreover, as discussed previously, the arbitrators had to determine whether the governmental interventions were lawful in order to resolve the seller's defense to liability for breach of quiet possession.

Furthermore, even if we accepted the plaintiffs' argument that the ultimate disposition of the material was not strictly necessary to every breach of quiet possession found by the arbitrators, it is clear that the arbitrators treated the disposition of the material as essential and, consequently, it was necessarily determined. In *Torrington Tax Collector, LLC* v. *Riley*, supra, 226 Conn. App. 211, this court adopted a new rule, "expand[ing] the applicability of the doctrine [of collateral estoppel] to encompass certain findings not strictly essential to the final judgment in the prior action. . . . Such findings may be relied upon [for purposes of collateral estoppel] if it is clear that the issues underlying them were treated as essential to the prior case by the court and the party to be bound. Stated another way, it is necessary that such findings be the product of full litigation and careful decision." (Internal quotation marks omitted.) Id., 229. Of the events constituting

breach by the seller, the arbitrators focused in particular on seizure as the event that denied the plaintiffs quiet possession and treated it as essential to their conclusion that the material was not stolen or misappropriated but was lawfully seized, thus making the seller liable. Moreover, the arbitrators' finding that the material had been seized was the product of full litigation and careful decision. The plaintiffs had the opportunity to advocate before the arbitrators, and they did so, *in favor of a finding that the material was never delivered to them, had not been stolen, and had been seized.* To prove that the material had been seized by governmental authorities, the plaintiffs submitted the "Qingdao Intermediate People's Court of Shandong Province Criminal Court . . . Criminal Judgment—2017-2018" (judgment). Among other things, "[t]he [judgment] ordered 'goods . . . that are seized or impounded on record will be auctioned. . . .' The judgment recorded that '[t]he public security organ sealed up, seized and frozen the real estate, land, equities, bank deposits . . . and goods . . . .' And that '[t]he criminal evidence articles transferred with the case are confiscated according to law. (The list attached hereinafter'). The list of goods 'attached hereinafter' included a specific reference to [the material] from the AS [Elysia] . . . ." (Emphasis omitted.)

Applying the Hollington rule, an English evidentiary rule that establishes that judicial findings on disputed issues of fact reached by earlier tribunals cannot be admitted as evidence in subsequent civil proceedings, the arbitrators acknowledged that they could not "have regard to findings of fact, but [concluded that] the [j]udgment recorded that the [m]aterial from the AS [Elysia] had been seized and was to be auctioned and this is . . . admissible as it is not a finding of fact, but merely a recitation of information provided to the [c]ourt." (Emphasis omitted.) The plaintiffs make much

of this evidentiary ruling, asserting that "[the arbitrators] made no actual finding that the material had been seized and, instead, merely accepted that the [Qingdao Intermediate People's Court] in a completely separate proceeding had been told that the material had been seized." (Emphasis omitted.) The plaintiffs, however, overlook the several other pieces of evidence relied on by the arbitrators to find that the material had been seized. The arbitrators also considered the following: CWT's complaint that it had been denied access on May 26, 2014; the preservation orders issued by the Qingdao Maritime Court to CITIC on June 3, 2014; the public announcement issued by authorities at the Qingdao port that there was an investigation and that QPGC had been asked to assist with preservation orders; that the Qingdao port was closed by the police on July 14, 2014; the list of goods attached to the judgment that specifically referenced alumina from the AS Elysia as "seized"; a 2019 appraisal report that was prepared after the Qingdao Intermediate People's Court order that the goods be auctioned and describes the material at that time as "sealed up by the Qingdao Intermediate People's Court"; the court's auction announcement; and testimony describing the warehouse where the material was stored as "a military port and heavily secured." It is evident from the thorough analysis of the issue in the third award that the arbitrators carefully weighed the proffered evidence and considered the relevant law in determining that the material had been seized.

We accordingly conclude that the issues of whether the material was stolen and/or misappropriated and whether it was seized were actually and necessarily decided in the arbitration proceedings and are identical to the issues involved in the present case. Because the arbitrators necessarily determined that the material was seized pursuant to an order of a Chinese court in the

arbitration proceedings, the trial court properly con-
cluded that the plaintiffs are precluded from arguing
that the material was stolen or misappropriated in the
present case or disputing that the material was seized
by government authorities.

## II

The plaintiffs next claim that, even if they are pre-
cluded from arguing that the material was stolen or
not seized due to the application of collateral estoppel,
genuine issues of material fact remain as to whether
(1) the plaintiffs suffered "physical loss or damage" to
the material within the meaning of the policies and (2)
the plaintiffs' alleged loss was subject to the seizure
exclusion.[9] Because we conclude that the resolution of
these issues overlap, we address them together. We
first set forth the applicable standard of review and
relevant legal principles regarding the interpretation of
insurance policies.

"[C]onstruction of a contract of insurance presents
a question of law for the [trial] court which this court
reviews de novo. . . . The determinative question is
the intent of the parties, that is, what coverage the
[insured] expected to receive and what the [insurer]
was to provide, as disclosed by the provisions of the
policy. . . . In evaluating the expectations of the par-
ties, we are mindful of the principle that provisions in
insurance contracts must be construed as laymen would

---

[9] The plaintiffs also claim that the court erred in concluding that the
arbitrators' finding that the plaintiffs did not have title to the material meant
that they did not have an insurable interest under the policies. We need not
decide this issue because, even if we assume that there is a genuine issue
of material fact as to whether the plaintiffs have an insurable interest under
the policies, as we conclude in part II of this opinion, the plaintiffs are
unable to establish physical loss or damage within the meaning of the policies
that was not the result of actions excluded under the seizure exclusion
to coverage.

understand [them] and not according to the interpreta-
tion of sophisticated underwriters and that the policy-
holder's expectations should be protected as long as
they are objectively reasonable from the layman's point
of view. . . . [W]hen the words of an insurance con-
tract are, without violence, susceptible of two [equally
responsible] interpretations, that which will sustain the
claim and cover the loss must, in preference, be
adopted. . . . [T]his rule of construction favorable to
the insured extends to exclusion clauses. . . . When
construing exclusion clauses, the language should be
construed in favor of the insured unless it has a high
degree of certainty that the policy language clearly and
unambiguously excludes the claim. . . . While the
insured bears the burden of proving coverage, the
insurer bears the burden of proving that an exclusion to
coverage applies." (Internal quotation marks omitted.)
*R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity
Co.*, 333 Conn. 343, 364–65, 216 A.3d 629 (2019).

The plaintiffs first contend that, assuming the court
properly estopped them from arguing that the material
was stolen or misappropriated, a genuine issue of mate-
rial fact nonetheless remains as to whether there was
"physical loss or damage" within the meaning of the
policies based on the material being inaccessible to the
plaintiffs. Specifically, the plaintiffs argue that "[their]
loss was realized when [they were] unable to take pos-
session of the [material] between December, 2013, and
June, 2014 . . . after [they were] given a warehouse
receipt in December, 2013."[10] (Citation omitted.) On the

___

[10] The plaintiffs additionally claim that "there exists a disputed issue of
material fact as to whether [the plaintiffs] suffered a covered loss due to
fortuitous incident [or] mysterious disappearance . . . ." We decline to
address these two additional theories of loss given that they were not
distinctly raised in the plaintiffs' complaint or opposition to summary judg-
ment, nor are they adequately briefed on appeal. See *DiMiceli* v. *Cheshire*,
162 Conn. App. 216, 229, 131 A.3d 771 (2016) ("Our appellate courts, as a
general practice, will not review claims made for the first time on appeal.
We repeatedly have held that [a] party cannot present a case to the trial
court on one theory and then seek appellate relief on a different one . . . ."

basis of our review of the relevant policy language and
our prior conclusion as to the effect of collateral estop-
pel, we are not persuaded.

The specific language of the policies in this case
provided in relevant part: "All goods and/or merchan-
dise ON DECK, UNDER DECK or otherwise are insured
. . . [a]gainst all risks of physical loss or damage from
any external cause including mysterious disappearance
and infidelity of Assured's employees."

The policies, however, do not define the phrase
"physical loss or damage." Connecticut courts have had
previous occasions to interpret the phrase "physical
loss or damage," as the phrase is used in property insur-
ance policies and both this court and our Supreme
Court recently have held that "physical loss or damage"
requires "some physical, tangible alteration to or depri-
vation of the property that renders it physically unus-
able or inaccessible." *Connecticut Dermatology Group,
PC* v. *Twin City Fire Ins. Co.*, 346 Conn. 33, 51, 288
A.3d 187 (2023) (*CT Dermatology*); see also *Hartford
Fire Ins. Co.* v. *Moda, LLC*, 346 Conn. 64, 72–73, 288
A.3d 206 (2023); *Mashantucket Pequot Tribal Nation*
v. *Factory Mutual Ins. Co.*, 224 Conn. App. 429, 455–56,
313 A.3d 1219 (2024).

For example, in *Connecticut Dermatology Group, PC*
v. *Twin City Fire Ins. Co.*, supra, 346 Conn. 63, our
Supreme Court concluded that a property insurance

(Internal quotation marks omitted.)); *Wilson* v. *Jefferson*, 98 Conn. App.
147, 166, 908 A.2d 13 (2006) ("[w]here the parties cite no law and provide
no analysis of their claims, we do not review such claims" (internal quotation
marks omitted)). Further, the plaintiffs previously conceded the inapplicabil-
ity of mysterious disappearance coverage before the trial court, arguing in
a motion in limine that "there is no mystery as to the plaintiffs' loss of the
material. . . . [T]his was incremental, systematic theft, not a mysterious
disappearance." Accordingly, we decline to consider these new theories
of loss that conflict with the plaintiffs' claims and arguments before the
trial court.

policy did not provide coverage for lost business income
and other incurred expenses arising from suspension
of business operations during the COVID-19 pandemic.
The policy in *CT Dermatology* provided coverage for
" 'direct physical loss of or physical damage to' " cov-
ered property. Id., 36. In interpreting this phrase, the
court held that "the plain meaning of the term 'direct
physical loss of . . . [p]roperty' does not include the
suspension of business operations on a physically unal-
tered property in order to prevent the transmission of
the coronavirus. Rather, in ordinary usage, the phrase
'direct physical loss of . . . [p]roperty' clearly and
unambiguously means that there must be some physi-
cal, tangible alteration to or deprivation of the property
that renders it physically unusable or inaccessible." Id.,
51. Accordingly, the court concluded that, given that
"there has been no physical, tangible alteration of [the
plaintiffs'] properties, no persistent, physical contami-
nation of the properties rendering them uninhabitable,
and no imminent threat of physical damage to or
destruction of the properties rendering them unusable
or inaccessible"; id., 63; there was no genuine issue of
material fact as to whether the policies did not cover
the plaintiffs' claims because the plaintiffs suffered no
"direct physical loss of . . . [p]roperty . . . ." (Inter-
nal quotation marks omitted.) Id., 63–64.

Similarly, in *CT Dermatology*'s companion case,
*Hartford Fire Ins. Co.* v. *Moda, LLC*, supra, 346 Conn.
64, our Supreme Court determined that the insurance
policies at issue did not provide coverage for financial
loss suffered by a shoe supplier following mass cancel-
lation of orders by retailers who were forced to tempo-
rarily close their business operations pursuant to state
government orders during the COVID-19 pandemic,
which created excess inventory of " 'unsellable' " shoes.
Id., 68, 79. Those policies also contained language pro-
viding coverage for "direct physical loss or direct physi-
cal damage . . . ." (Internal quotation marks omitted.)

Id., 75–76. On the basis of this language, and the court's holding in *CT Dermatology*, the court in *Moda, LLC*, likewise concluded that the supplier's claim failed because the losses it suffered "did not result from any tangible physical alteration to [its] stock or real property. Rather, those losses resulted from a transformation in governmental and societal expectations and behavior that had a seriously negative impact on [its] businesses." (Internal quotation marks omitted.) Id., 73.

We recognize that physical alteration of property is not the only way a covered loss can occur. In *CT Dermatology*, our Supreme Court agreed "with the plaintiffs to the extent that they contend that a 'direct physical loss' of a property need not always entail physical or tangible *alteration*. For example . . . a property that has been stolen has been physically lost even if its physical condition has not changed. . . . This is because a stolen property has been rendered *physically* inaccessible to the insured." (Citations omitted; emphasis in original.) *Connecticut Dermatology Group, PC* v. *Twin City Fire Ins. Co.*, supra, 346 Conn. 56. Likewise, the court in *Moda, LLC*, explained that, "[f]or example, property that has been stolen or lost at sea may not be physically altered but has been physically removed from the owner's possession and rendered physically inaccessible." *Hartford Fire Ins. Co.* v. *Moda, LLC*, supra, 346 Conn. 73 n.6. Nevertheless, the court explained that "[m]ere loss of use or access is not enough, unless that loss is caused by a physical alteration of the property or the physical removal of the property." Id., 72–73. The controlling principle in both cases is that "physical loss or damage" arising from physical inaccessibility requires some discrete physical event creating such inaccessibility, such as physical removal from the possession of the insured.[11]

---

[11] We note that the policy language at issue here does not require "direct" physical loss. Although the plaintiffs argue that *CT Dermatology* and *Moda, LLC*, are inapposite because the relevant policy language in those cases

As alleged in the underlying complaint and in their
opposition to the defendant's motion for summary judg-
ment, the plaintiffs purchased the material in Decem-
ber, 2013, requested access to the material on May 26,
2014, pursuant to a pending sale of the material, and
were denied such access on June 4, 2014. Although the
plaintiffs now argue before this court that their loss
was realized between December, 2013, and June, 2014,
this claim is absent from both their operative complaint
and their arguments in opposition to the defendant's
motion for summary judgment. In count one of the
operative complaint, the plaintiffs alleged that their loss
resulted from the "theft and/or misappropriation" of
the material. They further alleged that they first discov-
ered the theft on October 28, 2015, when, during an
inspection, they "only found 4522 [metric tons] of [mate-
rial] in the storage areas, representing a physical theft

---

required "direct" loss or damage, the absence of that adjective in the present
case is of no import. Terms such as "direct," "remote," or "indirect" bear
on the sufficiency of the causal connection between the loss and the covered
peril. See 10A J. Plitt et al., Couch on Insurance (3d Ed. Rev. 2024) § 148:60
("In a provision in a policy insuring against direct loss and damage caused
solely by a particular cause, the word 'direct' means merely 'immediate' or
'proximate' as distinguished from 'remote.' . . . The word 'direct' as used
in the phrase 'direct physical loss' in a property insurance policy is meant
to exclude situations in which an intervening force played some role in the
property damage." (Footnotes omitted.)); see also *Mashantucket Pequot
Tribal Nation* v. *Factory Mutual Ins. Co.*, supra, 224 Conn. App. 447 n.22
(addressing similar difference in policy language and concluding that,
"[a]lthough the policy does not specifically include the term 'direct' with
regard to 'physical loss or damage,' we note that [the policy] excludes
'indirect or remote loss or damage' "); *Newman Myers Kreines Gross Har-
ris*, *P.C.* v. *Great Northern Ins. Co.*, 17 F. Supp. 3d 323, 331 (S.D.N.Y.
2014) ("[t]he words 'direct' and 'physical' . . . ordinarily connote actual,
demonstrable harm of some form to the premises itself, rather than forced
closure of the premises for reasons exogenous to the premises themselves").
We need not address causation in the present case. See footnote 14 of this
opinion. Rather, the issue here is whether the plaintiffs alleged *physical*
loss or damage within the meaning of the policies. Accordingly, we conclude
that for the purposes of this appeal, the policy language in *CT Dermatology*
and *Moda*, *LLC*, is sufficiently similar and, thus, it is instructive in our
analysis of the claim before us.

of 5590 additional bags." They also alleged that during
the inspection they discovered that the tags designating
bags of material as belonging to the plaintiffs had been
changed. Thus, the plaintiffs alleged that, "as of October
28, 2015, only 504 [metric tons] of [the plaintiffs' mate-
rial] remained, with the other 24,746 metric tons appar-
ently having been stolen or misappropriated by
unknown entities either through outright removal or
through the changing of identifying tags on the
remaining bags." The plaintiffs thus alleged a loss due
to the physical removal or exercise of dominion over
the material by third parties. The complaint did not
allege a covered loss due to the denial of access to
the material between December, 2013, and June, 2014.
Similarly, in their opposition to the defendant's motion
for summary judgment, the plaintiffs argued that they
could prove that they suffered a physical loss or damage
because "a gradual diminution in the amount of material
could be observed over the course of site visits and
that the tags identifying the material which were used
to identify [the plaintiffs'] material were changed." Only
on appeal, in an effort to avoid the effects of the applica-
tion of collateral estoppel, have the plaintiffs attempted
to change their theory of when the loss occurred. "Our
appellate courts, as a general practice, will not review
claims made for the first time on appeal. We repeatedly
have held that [a] party cannot present a case to the
trial court on one theory and then seek appellate relief
on a different one . . . ." (Internal quotation marks
omitted.) *DiMiceli* v. *Cheshire*, 162 Conn. App. 216,
229, 131 A.3d 771 (2016).

Furthermore, the plaintiffs' claim fails on its merits.
They submitted no evidence before the trial court show-
ing that they were denied any access to the material
until they requested access on May 26, 2014, which
request was denied on June 4, 2014. Thus, most of
the period on which they rely in their appellate briefs,

December, 2013, until May 26, 2014, is completely irrelevant to the analysis of when any loss occurred. More importantly, though, mere denial of access does not constitute a physical loss. See *Hartford Fire Ins. Co.* v. *Moda, LLC*, supra, 346 Conn. 72–73. Assuming that the plaintiffs could prove that they had an insurable interest in the material, any such loss did not occur until they were actually deprived of that interest in the material. The court determined that any such deprivation occurred when the property was seized by government authorities. Thus, the court concluded that the plaintiffs "cannot escape the collateral . . . estoppel effect of . . . the third award's finding that all the material was seized by the local authorities and all of it was sold at auction. . . . These holdings effectively preclude [the plaintiffs'] argument relating to the policies' grant of coverage." (Citation omitted.)[12]

---

[12] To the extent that the plaintiffs assert that a loss occurred upon their purchase of the material in December, 2013, we are not persuaded. Courts that have addressed such an argument have consistently concluded that loss arising from interference with intangible rights, i.e., legal interest in possession, does not constitute "physical loss or damage." See, e.g., *Curacao Trading Co.* v. *Federal Ins. Co.*, 137 F.2d 911, 914 (2d Cir. 1943) (The court concluded that " 'physical loss or damage from any external cause' . . . did not include protection against loss which resulted from the issuance of spurious warehouse receipts. To conclude otherwise would be to change a policy of property insurance to one comparable to a guarantee of the warehouseman's obligation to deliver . . . ."), cert. denied, 321 U.S. 765, 64 S. Ct. 521, 88 L. Ed. 1061 (1944); *Lennox* v. *Chubb National Ins. Co.*, Docket No. 24-cv-1397 (JGK), 2025 WL 219159, *3–4 (S.D.N.Y. January 16, 2025) ("At bottom, the plaintiff's claim stems from defective title. . . . Physical dispossession caused by defects in title is different from physical dispossession caused by, for example, theft. . . . In this case, the [p]olicy does not cover the plaintiff's claim because defective title is not a 'physical loss.' "); *Eveden, Inc.* v. *Northern Assurance Co. of America*, Docket No. 10-10061 (GAO), 2014 WL 952643, *5 (D. Mass. March 12, 2014) ("[i]ntangible losses, such as a defect in title or a legal interest in property, are generally not regarded as 'physical' losses in the absence of actually physical damage to the property"); *HRG Development Corp.* v. *Graphic Arts Mutual Ins. Co.*, 26 Mass. App. 374, 377, 527 N.E.2d 1179 (1988) (rejecting defective title as basis for loss, reasoning "[n]or do we think the salient phrase ('physical loss or damage') fairly can be construed to mean physical loss in the absence of physical damage" (emphasis omitted)). Cf. *Tiffany & Co.* v. *Lloyd's of*

The plaintiffs further argue that the trial court "assumed that the loss was the result of 'seizure' of the [material]" and "ignored that [the plaintiffs'] loss occurred years before the auction when it was denied possession of the [material]—as plainly reflected in the [third award]." They argue that, consequently, there is "a genuine issue of fact as to when [the plaintiffs'] loss occurred and if [their] loss predated the alleged seizure, and whether the [seizure exclusion] therefore even applies, rendering the grant of summary judgment improper." This argument is unavailing.

The seizure exclusion, titled "[Free of Capture and Seizure] Warranty," provides in relevant part: "The following warranty shall be paramount and shall not be modified or superseded by any other provision included herein or stamped or endorsed hereon unless such other provision refers specifically to the risks excluded by this warranty and expressly assumes the said risks. . . .

"Notwithstanding anything herein contained to the contrary, this insurance is warranted free from: (a) capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences thereof or any attempt thereat, whether in time of peace or war and whether lawful or otherwise . . . ."[13]

---

*London Syndicates 33, 510, 609, 780, 1084, 1225, 1414, 1686, 1861, 1969, 2001, 2012, 2232, 2488, 2987, 3000, 3623, 4444, 4472, & 4711,* Docket No. 651544, 2024 WL 2927657, *24 (N.Y. Sup. May 3, 2024) (concluding that there was genuine issue of material fact as to whether plaintiffs' *permanent physical loss* of property after it was sold by third party constituted " 'physical loss and/or damage' "). These conclusions are consistent with our Supreme Court's previous holding that "physical loss or damage" requires "some physical, tangible alteration to or deprivation of the property that renders it physically unusable or inaccessible." *Connecticut Dermatology Group, PC* v. *Twin City Fire Ins. Co.,* supra, 346 Conn. 51.

[13] Although the seizure exclusion is titled as a "warranty" within the policies, we refer to it as an "exclusion" throughout this opinion as it is undisputed that it operates to exclude a loss due to seizure from coverage.

The trial court concluded that the seizure exclusion
unambiguously applied to the circumstances giving rise
to the plaintiffs' alleged loss. The court found that the
defendant had "satisfactorily shown that the [seizure]
exclusion bars [the plaintiffs'] claim under the policies."

The plaintiffs do not dispute that the seizure exclu-
sion clearly and unambiguously excludes coverage for
losses arising from government seizure or detention.
See *Blaine Richards & Co.* v. *Marine Indemnity Ins.
Co. of America*, 635 F.2d 1051, 1053 (2d Cir. 1980) ("the
general [purpose] of the [c]lause . . . is to exclude
from coverage losses arising from unforeseeable
actions of sovereign states against the insured vessel
or . . . the insured cargo"); see also *United States Sur-
gical Corp.* v. *United States Fire Ins. Co.*, Docket No.
28 20 11, 1990 WL 277471, *3 (Conn. Super. October 5,
1990). Moreover, the prefatory language "notwithstand-
ing anything herein contained to the contrary" has been
interpreted by courts to override any other provisions
in an insurance policy. See *International Multifoods
Corp.* v. *Commercial Union Ins. Co.*, 309 F.3d 76, 90
(2d Cir. 2002) ("the phrase '[n]otwithstanding anything
herein contained to the contrary' . . . means that the
[seizure exclusion] trumps any other provisions of the
[policy]").

The plaintiffs further concede that the material was
seized at some point but argue that there is a genuine
issue of material fact as to whether their loss occurred
before and independent of the seizure. In particular,
they argue that there is evidence that their loss occurred
when they were denied access to the material in June,
2014, years before when they claim that the seizure and
auction occurred.

The plaintiffs' argument is contradicted by the find-
ings of the arbitrators, which, as discussed in part I of

this opinion, are entitled to preclusive effect. Specifically, we concluded that the arbitrators necessarily determined when the material was seized in the third award. They found that "access to the [p]ort was restricted from the end of May 2014 because CWT complained that from [May 26] 2014, it had been denied access. By then the police investigation had started. On [June 3] 2014, [CITIC] obtained its preservation order." The arbitrators also found that, on June 3, 2014, "the authorities had called upon [QPGC] to assist in the enforcement of [preservation] orders in relation to certain metal products that were the subject of the investigation" into fraud relating to certain aluminum and copper products stored at the Qingdao port. Thereafter, "[o]n [July 14] 2014 the [p]ort was closed by the police. All of these facts paint a picture that access to the [p]ort was difficult and goods were sealed and subject to investigation and court preservation orders. That was still the state of affairs up until . . . the date of auction in April 2020." In the third award, the arbitrators further concluded that the seizure was the cause for the plaintiffs' denial of possession of the material, stating that "QPGC could not deliver the [m]aterial because it had been seized and confiscated by the police and subsequently by order of the [Qingdao Intermediate People's Court]." Consistent with our conclusion in part I of this opinion, given the arbitrators' findings in the third award that the preservation order was issued by the Qingdao Maritime Court on June 3, 2014, and that, following the issuance of the preservation order, "access to the [p]ort was difficult and goods were sealed and subject to investigation and court preservation orders," the plaintiffs are estopped from relitigating the fact that the material had been seized when they sought possession in June, 2014.

Moreover, courts have consistently concluded that the type of undisputed events that occurred in the present case constitute seizure within the meaning of the

seizure exclusion. Although our research has revealed no Connecticut precedent addressing the precise issue, courts in other jurisdictions have applied similar policy exclusions when an insured's loss is attributable to seizure or detention by civil authorities. See *Blaine Richards & Co.* v. *Marine Indemnity Ins. Co. of America*, supra, 635 F.2d 1053–54 (concluding that Food and Drug Administration's detention of imported goods constituted seizure or detention under policy's seizure exclusion); *Northern Feather International, Inc.* v. *Those Certain London Underwriters Subscribing to Policy No. JWP108 through Wigham Poland, Ltd.*, 714 F. Supp. 1352, 1361 (D. N.J. 1989) (loss arising from lawful detention of goods by customs was excluded from coverage by seizure exclusion); *Resin Coatings Corp.* v. *Fidelity & Casualty Co. of New York*, 489 F. Supp. 73, 75 (S.D. Fla. 1980) ("the seizure of the goods and their sale by Arabian Customs . . . was a seizure within the meaning of the [seizure exclusion]"); *Intermondale Trading Co.* v. *North River Ins. Co. of New York*, 100 F. Supp. 128, 130, 132 (S.D.N.Y. 1951) (detention of cargo for six months at Port of Gibraltar pursuant to governor's orders constituted seizure within meaning of policy's seizure exclusion).

We find particularly applicable the decision of the United States District Court for the Southern District of New York in *Petroterminal de Panama, S.A.* v. *Houston Casualty Co.*, 114 F. Supp. 3d 152 (S.D.N.Y. 2015), aff'd, 659 Fed. Appx. 46 (2d Cir. 2016), in which the court held that a judicial order resulting in the inability to access property constituted seizure within the meaning of the exclusion. Id., 161. In that case, the plaintiff owned and operated oil transportation and storage facilities in Panama. Id., 155. Following a minor oil spill at one of the plaintiff's storage facilities, the plaintiff faced a series of lawsuits in Panamanian courts. Id. Pursuant to one of those lawsuits, the Panamanian court issued

an order that attached the oil stored by a third party at the plaintiff's facilities. Id. As a result of the attachment, the third party did not have access to its property for six weeks. Id. The third party alleged that because of the attachment, it incurred business interruption damages. Id., 156. Following suit with the third party, the plaintiff sought indemnification under its marine cargo insurance policies and the defendant insurers disputed coverage. Id. The District Court rendered summary judgment for the defendant insurers, concluding that the policies did not provide coverage for the third party's loss because the loss was caused by the attachment. Id., 161. As a result, the claim fell within the exclusion in one of the policies for losses "resulting from . . . [c]apture, seizure, arrest, taking, restraint, detainment, confiscation . . . or the consequences thereof . . . ." (Internal quotation marks omitted.) Id. In concluding that the attachment constituted seizure, the court reasoned that "[t]he [a]ttachment by the Panamanian authorities was a form of seizure or detainment by legal process, and therefore falls squarely within the 'capture-seizure' exclusion. Accordingly, for this reason too, [the loss is] not covered by the . . . [p]olicy." Id. Thereafter, the United States Court of Appeals for the Second Circuit affirmed the District Court's conclusions. See *Petroterminal de Panama, S.A.* v. *Houston Casualty Co.*, 659 Fed. Appx. 46, 52 (2d Cir. 2016). Likewise, in the present case, the June 3, 2014 preservation order from the Qingdao Maritime Court, which resulted in the plaintiffs' inability to access the material, was a form of seizure or detainment by legal process. Like the attachment in *Petroterminal de Panama, S.A.* v. *Houston Casualty Co.*, supra, 114 F. Supp. 3d 152, the preservation order constituted a seizure squarely within the meaning of the seizure exclusion. Therefore, the plaintiffs' resulting loss, i.e., their inability to access the material in June, 2014, was excluded from coverage

under the policies. See *General Star Indemnity Co.* v. *Driven Sports, Inc.*, 80 F. Supp. 3d 442, 450 (E.D.N.Y. 2015) (finding no coverage where "the allegations in . . . the underlying complaints plainly reveal that [the claims] are excluded from coverage, because each claim . . . 'aris[es] out of' " excluded risk). Therefore, we conclude that the plaintiffs failed to show that a genuine issue of material fact existed as to whether their loss was excluded from coverage by the seizure exclusion.[14]

In sum, the court properly concluded that the plaintiffs were precluded, pursuant to the doctrine of collateral estoppel, from relitigating the issues of whether the material was stolen and/or misappropriated and whether it was seized by agents of the Chinese government. For this reason, they are unable to establish a "physical loss or damage" within the meaning of the policies that was not excluded from coverage under the seizure exclusion to coverage. Accordingly, we conclude that the court properly granted the defendant's motion for summary judgment.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[14] The plaintiffs also contend that the court failed to consider whether the seizure was the but for and proximate cause of the plaintiffs' loss. See *Blaine Richards & Co.* v. *Marine Indemnity Ins. Co. of America*, supra, 635 F.2d 1054–56 (considering whether detention or some earlier, covered peril was proximate cause of loss). As we have concluded in this opinion, however, the plaintiffs have failed to allege any other covered loss under the policies and, therefore, there are no genuine issues of material fact as to when the loss occurred or whether the loss predated the seizure. As a result, there is no genuine issue of material fact that the seizure exclusion applies in the present case. Consequently, it is unnecessary for us to consider whether the seizure of the material was the " 'predominant and determining' " or " 'real efficient' " cause of the loss because seizure is the only cause of the loss alleged by the plaintiffs. Cf. id., 1054.